### Polycarp L. BROUSSARD
#### v.
### PHILLIPS PETROLEUM COMPANY
#### and
#### Robert Mosbacher

**Added Defendants by Amended Complaint: Lucille Lyle, Lloyd Aubert, Mary A. Barnason, Lionell Barnason, Frank Broussard, The Marbet Company, a Partnership Composed of Martin J. Weil, Mary W. Gettle and Elizabeth W. Coney and Tidewater Oil Company.**

#### Civ. A. No. 6389.

United States District Court
W. D. Louisiana,
Opelousas Division.

April 24, 1958.

906

J. J. Davidson, Jr., Lafayette, La., J. E. Kibbe, Abbeville, La., Lawrence E. Donohoe, Jr., Lafayette, La., for plaintiff.

Charles F. Bailey, Lafayette, La., James N. Erwin, Jr., Houston, Tex., Martin J. Weil, Los Angeles, Cal., for defendants.

HUNTER, Judge.

This suit for cancellation of an oil, gas and mineral lease (as to part of the acreage covered thereby) was instituted in state court and removed to this court by defendant on the basis of diversity. The land involved has considerable value and comprises 29.526 acres by actual survey. The delay rentals which accrued October 19, 1956, as to the land in question, were not paid or tendered by defendants; nor were drilling operations conducted on or production obtained from that portion of the land prior to that date.

Plaintiff asks for judgment on the face of the papers and both sides candidly concede that there is no factual dispute. These facts may be simply stated.

On October 19, 1953, plaintiff granted an oil, gas and mineral lease to Robert Mosbacher for a primary term of five years covering two tracts of land in the North Erath area of Vermilion Parish, Louisiana, each containing 36.2 acres. On June 28, 1955, Mosbacher assigned

the lease to Phillips Petroleum Company, less and except certain reserved interests.

The lease was executed on Form 42 CPM–New South Louisiana Revised 4 Pooling—a lease form in general use in South Louisiana. It contains the usual delay rental clause whereby lessee is authorized to defer drilling operations during the primary term by the annual payment of a delay rental—in this case at the rate of $5 per acre. The lease also provides that lessee may designate units not exceeding 40 acres for oil and 160 acres for gas, and that drilling operations on or production from land included in a pooled unit (whether or not on or from the land covered by the lease) will hold the entire acreage both within and without the unit. *However, there is a very important addition to the lease in the form of a typewritten clause, which provides, in short, that "notwithstanding any provision" of the lease to the contrary, drilling operations on or production from a pooled unit established under Paragraph 2 of the lease, embracing a part of plaintiff's lands and other lands will serve to maintain the lease in force and effect only as to the lands in the unit, and that the lease may be maintained as to the remainder of the land only by doing so in a manner provided for in the lease; and if it is to be done by delay rental payments, delay rentals are payable only on the acreage outside such unit. This clause, commonly known in the area as the "Pugh Clause", is set forth fully in the footnote* [1].

Lessee paid the full delay rental accruing under the lease (for its entire acreage) on October 19, 1954 and October 19, 1955, thereby maintaining the lease in full force and effect without further action or payments until October 19, 1956. In the meantime, on October 7, 1955, lessee designated a 160-acre gas unit, as provided in the lease, comprising, with other lands, all of Tract 2 of the lease, and 6.708 acres from the southern portion of Tract 1. There was excluded from the unit 29.526 acres of Tract 1 of the lease, which is the tract involved in this suit. Shortly thereafter lessee *drilled a well on Tract 2 of the lease* (all of which was in the unit), and completed it in the Champagne Sand as a commercial producer of gas and distillate on December 19, 1955. This well has been continuously producing since that time.

Shortly after the completion of the above well, Tidewater Associated Oil Company (now Tidewater Oil Company) drilled a well on its U. Richard lease, to the north, and on July 5, 1956, completed it in the same sand as a producer of gas and distillate. The Tidewater lease was not included in the designated 160-acre unit above referred to, but its Richard well was located about *400 feet north* of the 29.526 acres involved in this suit. The south line of the disputed parcel is approximately 1,000 feet north of the Phillips-Mosbacher well on Tract 2 of plaintiff's lease. The tract in dispute is located between the above two wells.

The Phillips-Mosbacher well on plaintiff's tract, Tidewater's Richard well, and several other wells in other parts of the North Erath Field were exploratory wells and enabled the operators to better define the geology of the area. The geo-

---

1. "Notwithstanding anything to the contrary herein contained drilling operations on or production from a pooled unit or units established under the Paragraph 2 hereof embracing land covered hereby and other land shall maintain this lease in force only as to land included in such unit or units. The lease may be maintained in force as to the remainder of the land in any manner herein provided for, provided that if it be by rental payment, rentals shall be payable only on the number of acres not included in such unit or units. If at the end of the primary term this lease is being maintained as to a part of the land by operations on or production from a pooled unit or units embracing land covered hereby and other land, Lessee shall have the right to maintain the lease as to the land not included in such unit or units by rental payments exactly as if it were during the primary term provided that his right to pay rental shall terminate five years after the end of the primary term."

logical information thus obtained necessitated a revision of the unit pattern of the field (only voluntary units had been theretofore created) so that the various parties involved would receive their equitable share of production from the common pool or pools. Accordingly, on August 31, 1956, application was made to the Conservation Department for the establishment of several units for the Champagne Sand, including a 302.3+ acre unit upon which was located Tidewater's Richard well and a 294.6+ acre unit on which was located the Phillips-Mosbacher well situated on Tract 2 of plaintiff's lease. Plaintiff was duly notified of this application. In due course, on October 17, 1956, *two days before the next rental under plaintiff's lease,* the hearing on this application was held and completed. On December 19, 1956, the Department of Conservation issued its Order No. 34–E (effective as of January 1, 1957) granting the application and establishing units in accordance therewith, including the two units above referred to. These two units included all of the land covered by plaintiff's lease, the Phillips-Mosbacher 294.6+ acre unit including all of tract 2 and 11.959 acres of tract 1, and the Tidewater 302.3+ acre unit including the balance of Tract 1.

Order No. 34–E was based on the evidence adduced at the hearing of October 17, 1956, and it included a specific finding by the Commissioner that one well located on each of the units would "efficiently and economically drain an area the size of the unit upon which it is located, and will give the owners of acreage overlying the reservoir an opportunity to receive their just and equitable share of the reservoir content." The order adopted the existing wells on the various units, including those on the two units above referred to, as the unit wells, and enjoined the drilling of any further wells thereon.

At this point it will be observed that: (1) plaintiff's lease was independently held in force as to its entire acreage by delay rental payment until October 19, 1956; (2) all of plaintiff's acreage, except the 29.526 acres here in dispute, was in a voluntary 160 acre unit which was producing, on and prior to the rental date in question (October 19, 1956), from a unit well located on tract 2 of plaintiff's lease; (3) defendants did not pay any delay rental for the acreage (29.526 acres) outside of the 160-acre unit on said rental date; and (4) the Conservation Department units, which included said outside acreage, were not in force on the rental date hereof, being made effective on January 1, 1957, but the hearing before the Commissioner establishing the necessity for those units and also establishing that any additional wells would be unnecessary wells causing waste had been completed prior to the rental date.

Based on the foregoing, plaintiff says that the lease contract required that defendants drill the 29.526 acre parcel or pay rental therefor and since defendants did neither on the rental date, the lease was terminated as to that property which was outside the voluntary unit prior to October 19, 1956. To this action defendant interposes several defenses, as follows:

(1) That inasmuch as the unit well was physically located on plaintiff's lands, the Pugh clause is not applicable, and there was no necessity for paying or tendering the rentals due October 19, 1956; as to the outside acreage, nor was there any necessity for drilling on or producing therefrom.

(2) Alternatively, that prior to October 19, 1956, defendants had applied to the Commissioner of Conservation for the establishment of units; a hearing thereon was held October 17, 1956; orders were issued December 19, 1956; during the pendency of the application, defendants could not have obtained a permit to drill a well on plaintiff's acreage outside the voluntary unit; that the payment of delay rentals is but an optional method of maintaining the lease, the other method being by drilling; that since defendants could not drill on plaintiff's outside acreage, defendants were relieved from the liability of paying the

delay rentals which accrued October 19, 1956.

(3) Alternatively, that the admitted obstacle to the drilling on the acreage in dispute, together with the uncertainty as to the meaning of the so-called "Pugh clause" are sufficient to render the non-payment of rental (if one was due, which is denied) an innocent and reasonable mistake and plaintiff should now be required to allow defendants to rectify its error.

(4) In the further alternative, that plaintiff has "retained" royalty checks for production from one of the units established by the Commissioner of Conservation and is "estopped" from bringing this action, and that his actions constitute a ratification of the lease.

Plaintiff urges that under the lease contract and the jurisprudence of the State of Louisiana, he is entitled to the relief sought, and that none of the defenses asserted are meritorious in law.

### 1.

█ █ The first contention of defendant is that inasmuch as the voluntary unit well was located on plaintiff's lands, the "Pugh" clause is not applicable, and that there was no obligation to pay the rentals due October 19, 1956, as to the outside acreage—nor was there any necessity for drilling on or producing therefrom. We do not agree. The effect of the clause is to divide or segregate the lease once the lessee takes any action under paragraph 2 thereof; thereafter the lands included in a unit or units are segregated from the balance of the leased acreage. The same result obtains irrespective of whether the unit well is located on the leased premises or on other lands in the unit. In the case of unitization, incomewise, it matters not to the landowner where the unit well is located. His income is based solely on the number of acres he has in the unit. The "Pugh" clause is clear and unam-

biguous and leaves no room for doubt as to its meaning and import. The 29.-526 acres were segregated from the balance of the leased acreage under the facts of this case and defendants were obliged to pay delay rentals or drill in order to keep the lease in force thereon—unless relief is to be accorded the defendants under one of their other defenses.

### 2.

█ We pass next to defendants' contention that the lease has been held in force by operation of law under the conditions set forth in the pleadings, which establish that on and since the rental date in question, defendants would not have been permitted to drill on the acreage here involved as the State Conservation Department could not and would not issue a permit for the drilling of such a well, because the hearing for the creation of forced units had already been held establishing that another well on the acreage in dispute would be an "unnecessary well" resulting in waste by the Conservation Department's laws, rules and regulations. Plaintiff admits all of this but argues that this in no way effects his case, as an "unless" lease is here involved and under such a lease the lessee's rights are terminated on its failure to drill or pay within the time stipulated, in accordance with the terms of the lease contract[2]. *We agree that this is so and there was no reason whatsoever that the delay rentals could not be paid during the pendency of defendants' application before the Commissioner of Conservation.* There was certainly no obstacle to the payment.

The arguments of the defendants are parallel to the one made by the lessees in Texas Company v. State Mineral Board, 216 La. 742, 44 So.2d 841, 844. There, the lessees contended that they were relieved from the payments of rentals should the Federal Government contest the state's title to the leased

---

**2.** Amos v. Waggoner, 229 La. 134, 85 So.
2d 58; Atlantic Refining Co. v. Shell Oil
Co., Inc., 217 La. 576, 46 So.2d 907;
Wilcox v. Shell Oil Co., Inc., 226 La. 417,

76 So.2d 416; Texas Company v. State
Mineral Board, 216 La. 742, 44 So.2d
841.

premises (tidelands). Plaintiff, in brief, asserts "the defendants would have this court add to the lease contract a provision which is not there—that is, if the defendant cannot drill, they do not have to pay delay rentals". We agree with plaintiff that this court cannot so do. What the Supreme Court of Louisiana said in the Texas Company case is applicable here, to-wit:

"We find no merit in the contention. In the first place, the application of equity to the mineral leases sought to be reformed (although plaintiff protests vehemently that it is seeking only a declaration of its rights under the leases the effect of the plea, if granted, would be to supplement and reform the contract) would not be appropriate as they are free from ambiguity and state explicitly the entire agreement of the parties.

"Article 1901 of the [LSA–] Civil Code provides that agreements legally made have the effect of law upon the contracting parties and ' * * * can not be revoked, unless by mutual consent of the parties, or for causes acknowledged by law. * * *' And, as observed in Moriarty v. Weiss, 196 La. 34, 198 So. 643, 656, 'it is not the province of the court to alter by construction or to make new contracts for the parties. The duty of the court is confined to the interpretation of the agreements the parties have made for themselves, and, in the absence of any ground for denying enforcement, to give effect to the agreements as made.' "

Defendants insist that the situation presented here is squarely governed by the Louisiana Supreme Court case of Sohio Petroleum Company v. V. S. and P. Railroad, 222 La. 383, 62 So.2d 615, 620. There involved was a lease on the so-called "unless" lease form. The lease was dated in the early part of 1946 and provided that a well be drilled within one year from date on penalty of termination as to both parties, *unless* on or before the anniversary date a delay rental be paid for the deferment of the obligation for twelve months and for similar yearly deferments by the payment of a like rental annually during the primary term. Article 5 of the lease provided, among other things, that if after the discovery of oil, gas or other minerals, the production should cease from any cause, the lease would not terminate if lessee commenced operations for additional drilling or re-working operations within sixty days thereafter or (if it be within the primary term) commences or resumes the payment of rentals on or before the rental paying date next ensuing after three months from date of cessation of production. The same article gave the lessee the right, in order to form a drilling unit or units, to conform to regular or special spacing rules issued by the Commissioner of Conservation, its option to pool or combine the lands covered by the lease, or any portion thereof, with other land, lease, or leases in the immediate vicinity. The lease was located in the Delhi Field and the Conservation Department established drilling units of 40 acres each for the production of oil or gas from the field, such units to follow the regular outline of governmental 1/16th sections, and only one well being allowed for each unit. On August 1946, *within the first year of the lease and before any rentals were due a well (Kingwood Jones No. 1) was completed on the unit including plaintiffs' lands.* This well was capable of producing gas in paying quantities and the area forming the drilling unit was considered to be a fully developed area within the meaning of the state conservation act. (*In the case now before the court there was no established unit embracing the land in question nor was there a completed well on it on the rental date.*) The Kingwood-Jones No. 1 was capped. Lessee did not pay delay rentals accruing on the anniversary date of the lease. In August, 1957, during the second lease year, lessee obtained a permit to drill an oil well at another location on the same unit as an exception to the well

location fixed in the original department-al order and this well was completed in September, 1947. The primary cause urged by all of the plaintiffs (with an exception not important here) for the cancellation of their leases was that they terminated because of no drilling on their property within the year and the failure to pay rent for the delay. Of course, there had been drilling on the unit and the Louisiana Supreme Court refused to cancel the leases. Said the Court:

> "Consequently, when the Kings-wood-Jones No. 1 well was completed as a well capable of producing gas in paying quantities, within the year provided in the lease, the area forming this drilling unit was considered to be a developed area within the meaning and contemplation of the act, and Article 5 of the lease is not applicable."[3]

The Court then proceeded to add this verbiage to the same paragraph:

> "in fact, another well could not have been drilled on this same unit without specific authorization, as secured in this case, i. e. by obtaining an order from the Commissioner of Conservation, following a full hearing and based upon his findings, warranting such exception to basic Order No. 96."[4]

The Court then concluded, still in the same paragraph:

> "It necessarily follows that the lease did not terminate for failure to pay rentals."

Our interpretation of this language is that the rentals were not due because a well had been drilled and completed capable of producing gas in paying quantities within the year as provided in the lease and the area forming the drilling unit was considered to be a developed area. In the present case there was no unit embracing plaintiff's land on which there was a completed well on the rental date. The unit, in which plaintiff's land was eventually placed, was non-existent at the time. The order creating the unit in the case before us was issued on January 1, 1957, several months after the lease had terminated for failure to pay rentals on October 19, 1956.

### 3.

We next pass to defendants' next defense that the nonpayment of rental (if one was due, which is denied) was an innocent mistake and plaintiff should now be required to allow defendants to rectify their error. In support of this defense, counsel cites Jones v. Southern Natural Gas Company, 1948, 213 La. 1051, 36 So.2d 34. There, the lease describes by governmental subdivision certain lands which were estimated in the lease to comprise 518.82 acres. The delay rental stipulated was 518.82, or One Dollar per acre. The original lease assigned to defendant 7½ quarter-quarter sections described by governmental subdivision; had the sections been regular 640–acre sections, the acreage assigned to defendant would have amounted to 300 acres, which is the amount of acreage defendant thought it had acquired in the assignment, and which was the amount of acreage called for by the assignment. Defendant tendered to lessor-plaintiff a delay rental of $300 which was accepted. The following year defendant again tendered the $300, which plaintiff this time refused, having realized that the total rental payments should have been $518.-82. A suit was instituted to cancel the lease for failure to pay delay rentals, and the court held that the plaintiff was not entitled to forfeiture. The court observed that this was a case of "mutual error." In a concurring opinion, Chief Justice Fournet observed that the lessor had accepted one rental payment of $300 without complaint, and that therefore the lessee was entitled to presume that the amount previously paid was correct.

3. Article 5 refers to delay rentals being due, etc. (supra).

4. This language lurking in Sohio seemingly provides comfort for defendants and they, with great earnestness, assert it to be controlling.

The situation now before this court is altogether different. There, the lessee actually paid timely the delay rentals which it thought it owed, whereas here, no payment or tender of any rentals were made until months after the lease had by its own terms expired. There, the lessee had paid an incorrect rental the first time which the lessor had accepted, thus misleading the lessee to believe that the prior payment was correct; whereas here, defendants, on October 19, 1955, had paid the correct amount of rental but failed to pay any rentals at all on October 19, 1956. There was on the part of the lessor in the Jones case a mistaken belief that the rental was $300, so the error was mutual. But in the instant case it was unilateral, being exclusively that of the lessee's. In Atlantic Refining Company v. Shell Oil Company, Inc., 217 La. 576, 46 So.2d 907, 910, the Jones decision was sharply limited to its facts. In that case Shell acquired from Atlantic's lessor a mineral interest in the leased premises on a printed Form D, from which was stricken words conveying to Shell an interest in the delay rentals; thus, Shell acquired a mineral interest which did not participate in rental payments. Atlantic ordered an abstract of title and when the abstractor typed the Shell deed, he omitted entirely the deleted clause, so that it appeared from the copy of the deed in the abstract that Shell simply acquired a mineral interest, which under the law would entitle Shell to participate in delay rentals. Neither Shell nor the lessor furnished Atlantic a certified copy of the transfer. Atlantic, relying entirely on the copy of the deed in the abstract, paid Shell a portion of the rentals which should have been paid to the lessor. Shell immediately top-leased Atlantic and in the suit Shell's lease was held valid. The Court pointed out that Atlantic could have relied on its lease contract calling for notice of change of ownership by certified copies, and that since Atlantic strayed from its lease contract it did so at its peril. Atlantic pleaded in equity the Jones case. Of the Jones case the Court said:

"The facts presented a mutual mistake, since the plaintiff herself did not know the amount paid by the defendant was insufficient, but only knew that she had not received a total of $518 (the full rental). Having accepted the first payment as being sufficient, she was estopped to demand a forfeiture."

By analogy plaintiff cites and relies on Phillips Petroleum Company v. Curtis, 10 Cir., 1952, 182 F.2d 122, 125. There, as here, Phillips failed to pay a delay rental timely under an "unless" type lease. There, as here, the rental was not paid by Phillips purely because of error or omission on its part. There, as here, Shell attempted to prevent forfeiture on equitable grounds. In rejecting Phillips' argument, and ordering the lease terminated, the Tenth Circuit Court said:

"Under and 'unless' lease the lessee has an option to continue the lease in force by paying the stipulated rental on or before the designated date, and it is subject to termination at his will, which privilege he may exercise by a failure to commence a well or pay the rental within the time stipulated in the lease, in which case the lease automatically terminates.

"When a contract is optional in respect of one party thereto, it will be strictly construed in favor of the other party; and an 'unless' lease is construed 'most strongly' against the lessee and in favor of the lessor.

"Time is of the essence of the provision in an 'unless' lease for the payment of delay rental; and the payment of the delay rental on or before the specified date is a condition precedent, which must be performed in order to continue the lease in force and give the lessee the right to defer drilling operations; and such a lease is automatically terminated at the end of the original term, upon failure of the lessee either to commence a well or to pay the delay rental on or before the speci-

fied date, by reason of the agreement of the parties."

The Court continued to review the Oklahoma decisions and pointed out that in all cases where equitable considerations had prevented forfeiture the mistake or error was that of independent agencies over which the lessee exercised no control. Continuing, the Court said:

"In no case, so far as we have been able to discover, has the Supreme Court of Oklahoma held that the lessee was entitled to equitable relief from the termination of an 'unless' lease by reason of failure to pay the delay rental within the time specified in the lease whether failure although unintentional, was caused by a mistake of an employee or agent of the lessee in the performance of his duties, acting under the direction, supervision and control of the lessee."

The jurisprudence indicates that equity will prevent a forfeiture only in exceptional circumstances, such as mutual error by lessor and lessee, or failure of some independent agency over which the lessee exercises no control to properly and timely transmit the delay rental. But in no case will equity prevent the termination of the lease by its terms where the failure to pay rental is the result of a unilateral error on the part of the lessee; further, there is no case applying the equitable consideration where, as here, there was no effort at all on the part of the lessee to timely and promptly pay the delay rental. The lease provided for a payment of delay rentals on or before October 19, 1956. Defendants are asking this court to permit the rentals to be paid now in the year 1958. Texas Company v. State Mineral Board, referred to previously, provides a complete answer thereto. We conclude on this point by paraphrasing from the opinion of the Tenth Circuit Court of Appeals in the Curtis case and stating our conclusion that under the law of Louisiana denial of equitable relief, harsh as it may seem, is perfectly prop-

er and necessary under the facts and circumstances of this case.

### 4.

The last defense raised by defendants is that plaintiff "retained" royalty checks from the Commissioner's unit affecting the outside acreage (which was established several months subsequent to October 19, 1956) and that he is estopped to urge the forfeiture of the lease.

■■ It should be observed that defendants retained the checks; he has not cashed the checks. There is no allegation that such acts or course of conduct by plaintiff was relied on by defendants or that defendants changed their position or did anything detrimental to their position because of said conduct. These are essential and vital elements to a plea of estoppel, and the failure of defendants to allege them is fatal to that plea. See State ex rel. Porterie v. Gulf, M. & N. R. Co., 1938, 191 La. 163, 184 So. 711; Brock v. Black Rogers & Co., Ltd., 1942, 201 La. 1017, 10 So.2d 790. Also New La. Digest, Estoppel, ⊕24 and 25 and numerous cases cited there.

Further, there simply are no authorities supporting defendants in this position; in fact, there are many authorities to the effect that estoppel is not appropriate in these circumstances.

In Wilcox v. Shell Oil Company, 1954, 226 La. 417, 76 So.2d 416 the court held that the execution of royalty division orders and the *cashing of royalty checks* did not estop the plaintiff from suing for forfeiture of the lease for non-payment of rentals. Louisiana Live Stock and Planting Company v. Kendall, 1924, 155 La. 122, 98 So. 862, 863, is authority for the proposition that a plea of estoppel is not applicable nor appropriate after the right of forfeiture has already accrued. There it was declared that the portion of a lease provided for the production of oil from an existing well on the premises and the monthly payment of royalties therefor was independent of the requirement that a new well be drilled within one year. And, although the Court referred to the receipt of royalties by the

plaintiff from the well the lessee was required to operate as one of the considerations of the lease, it was held that the acceptance of such royalties after the accrual of the right of forfeiture for failure to drill the new well "could not possibly operate as an estoppel", nor could it in any other manner affect plaintiff's right to take advantage of his right of forfeiture.

The unit from which the checks referred to were issued was created after the rental payment date had passed; after the lease on the outside lands had already terminated and were simply held or "retained" by plaintiff and not "cashed."

### Conclusion

Plaintiff is entitled to the relief sought and proper decree should be presented.