140 So.2d 19 (1962)
Casey PIERCE, Plaintiff-Appellant,
v.
The ATLANTIC REFINING COMPANY et al., Defendants-Appellees.
No. 504.
Court of Appeal of Louisiana, Third Circuit.
March 21, 1962.
Rehearing Denied April 25, 1962.
Certiorari Denied June 4, 1962.
*20 O. H. Deshotels, Jr., Kaplan, for plaintiff-appellant.
Bailey & Mouton, by Kenneth J. Bailey and George J. Bailey, Lafayette, Oliver, Digby & Fudickar, by Charles L. Hamaker, Monroe, William Conrad, Legal Dept., Texaco, Inc., New Orleans, for defendants-appellees.
Before TATE, FRUGÉ and CULPEPPER, JJ.
FRUGÉ, Judge.
Plaintiff-appellant, Casey Pierce, as fee owner of two (2) tracts of land consisting of approximately 25 acres of land, brought suit against the Atlantic Refining Company and others to have oil, gas and mineral leases[1] declared null and void for certain breaches of contract. The cause was submitted on an agreed stipulation of facts and exhibits made a part thereof (Exhibit A thru N) and on evidence adduced at the trial. From a judgment dismissing the suit, plaintiff has appealed.
The undisputed facts in the record show that the plaintiff-Casey Pierce is the fee owner of the following property:
TRACT No. 1.
That certain portion of land lying and being situated in the Seventh Ward of Vermilion Parish Louisiana, and lying within section 87, township 14 south, range 3 east, bounded now or formerly, on the north by Gaston Hebert, on the east by Bayou Vermilion, on the south by Pinckard Foster and on the west by center line of State Highway running between Abbeville and Intracoastal city, containing in all 10 acres, more or less, LESS AND EXCEPT a strip having a front of 100 feet on said State Highway by a depth of 300 feet, more or less, to Bayou Vermilion, and being taken along the south line of the above described property. Said strip sold to Pothier J. Voorhies by Casey Pierce on January 5, 1949, by instrument recorded in Conveyance Book 199, page 524, records of Vermilion Parish, Louisiana.
TRACT No. 2.
A certain tract of land situated in Section 87, township 14 South, range 3 east, containing 15 acres, more or less, bounded now or formerly, as follows: North by Gaston Hebert, on the south by Pinckard Foster, on the east by State Highway No. 43, and west by Casey Pierce (Tract 1 above described).
At the time of the trial the defendant owned the leases on these two (2) tracts.
In his REASON FOR JUDGMENT, the trial judge stated:
"The facts, as established by an agreed stipulation and the evidence brought out on the trial are as follows:
"1. The two tracts of land were leased on October 10, 1950, in separate *21 leases executed by the then owner thereof in favor of Houston Oil Company of Texas as lessee, these leases being of record in conveyance Book 219, page 318, under entry No. 103963 [Tr. 135] and in conveyance book 219, page 324, under entry Number 103965 [Tr. 137], records of Vermilion Parish, Louisiana. Both leases were for a primary term of five years from and after October 24, 1951.
"2. A temporary development unit designated Live Oak Gas Unit Iv was formed by the Department of Conservation of Louisiana, in its order No. 300-A effective May 1, 1955, pursuant to which a well was drilled on land belonging to Gaston Hebert, which was completed on April 2, 1956. The two tracts of land owned by plaintiff were included in this development unit, and, by Conservation order No. 300-A-2, said unit was made a permanent unit [Tr. 145 thru 148].
"3. On June 6, 1956, Houston Oil Company of Texas conveyed its interest in the above mentioned leases and other properties to defendant Atlantic Refining Company, reserving certain production payments therefrom [Exhibit `I'].
"4. In July, 1956, the attorney for plaintiff, while in Houston, called the defendant's Houston Office and inquired relative to the royalty to be paid plaintiff from the Hebert transfer from Houston Oil Company of Texas and told that Mr. Pierce would hear from them in the future.
"5. On or about August 22nd, 1956, plaintiff's attorney called at the office of defendant at Lafayette, Louisiana and spoke to someone at that office regarding Mr. Pierce's royalty. He was advised to write one Ross E. Williams.
"6. On or about August 23, 1956, plaintiff's attorney addressed a letter to Ross E. Williams P. O. Box 2819, Tulsa, Oklahoma, to make written demand on defendants under the leases in question [Exhibit K, Tr. 167]. This was an erroneous address, Mr. Williams, being employed by defendant but having his office in Dallas, Texas with mailing address P. O. Box 2819. This letter was returned to plaintiff's attorney.
"7. A carbon copy of the above letter of August 23, was forwarded to defendant's office in Lafayette, Louisiana, where it was received and filed.
"8. On September 21, 1956, defendant forwarded plaintiff a royalty division order for execution, which was signed and returned to defendant on September 29, 1956 [Tr. 168 to 177].
"9. On October 3, defendant informed plaintiff that his royalty on account of production from this unit would be forth coming as soon as the necessary accounting work could be done [Tr. 173-178].
"10. On October 25 the attorney for plaintiff wrote defendant demanding cancellation of the leases for non payment of the royalty.
"11. Between October 25th, 1956 and October 31, 1956, checks were issued by defendant for accrued royalties, which were refused.[2]
"In addition to the foregoing, the evidence taken at the trial shows that Mr. Deshotels, attorney for plaintiff, did call at the office of Atlantic Refining Company in Lafayette during the latter part of August, 1956, and spoke to a gentleman in that office who he thought was Mr. Albright. Mr. Albright, regional landman of the defendant *22 company testifies positively that he was not in the office on the date of August 22 or August 23 as he was in Dallas on those dates closing the sale of his former home in that city, he having just moved to the City of Lafayette.
"He further states that he did not give Mr. Deshotels, Mr. Williams' address as P. O. Box 2819, Tulsa, Oklahoma, inasmuch as neither Mr. Williams, the Atlantic Refining Company, nor any person connected with the defendant has an office in that city. The court wishes to state that it is satisfied from the testimony of Mr. Deshotels that he did call at the Atlantic office in Lafayette, and that he did speak to someone in that office relative to this lease. However, in view of the positive testimony of Mr. Albright, corroborated by the fact that he was in Dallas on August 23, signing a sale of real estate, it is my opinion that Mr. Deshotels was mistaken as to the identity of the person to whom he spoke. How the erroneous address came into his possession, whether through a misunderstanding or error on his part, or on the part of the person to whom he spoke, is not reflected by the testimony. * * *"
Plaintiff, relying primarily upon Melancon v. Texas Co., 230 La. 593, 89 So.2d 135, Bollinger v. Texas Co., 232 La. 637, 95 So.2d 132, and Bailey v. Meadows, La.App., 130 So.2d 501 (writs denied), strongly contends that royalties due him were not timely paid, that under the terms of the lease, facts and circumstances of this case, as well as the jurisprudence he was entitled to have the lease cancelled judicially; and that the trial court erred in refusing to award judgment in his favor, in which we concur. We note that the defendant argues that the lease fixes no time for payment of royalties and hence the lessor should not ask for a cancellation. In the Melancon case, supra, some of the very same contentions were made by the defendant, as will be shown from the following:
"* * * And we think counsel's position is fairly well stated in his further remarks that `The only serious factual dispute between Plaintiff and Defendant is in connection with this phase of the case; and it only relates to testimony of what was said by Plaintiff and by Defendant's representatives in connection with accrued royalties and the alleged demands that were made for payment after the well was completed. But it is Defendant's contention that whether Plaintiff's appreciation of the evidence is accepted or not it would make no difference * * *. The Melancon lease, like the usual commercial form, does not fix a time for the payment of production royalties. Nor does it give the right of cancellation for failure to pay or for delay in paying royalties that have accrued. The lease, in fact, by two specific provisions, denies the right of cancellation even if a demand has been made; those provisions being found in paragraphs 7 and 8 * * *.' As otherwise stated in the same brief: `* * * even if the Lower Court's finding of facts is accepted, even if the jurisprudence generally would allow cancellation of some leases after demand for payment of royalties and a refusal to so pay, the lease in this case, which is the law between the parties, by the provisions of paragraph 7, denies cancellation; and that provision in itself should cause the reversal of the judgment of the lower court * * *;' and `* * * regardless of what happened during the delay in payment of royalties, and even if that delay had reached the point of being a violation of the contract, the lease itself also denied the right of forfeiture by the provisions of paragraph 8, generally referred to as the "judicial ascertainment" clause * * *;' concluding `* * * so the ultimate effect *23 of the clause must be that it denied the right of cancellation of the lease for a delay in payment of royalties, when no time was fixed therefor, even though it should be found from the evidence that a demand was made and refused * * *.' In any event, if judgment decreeing cancellation should be upheld, it should be ineffective as to the 38 acres of plaintiff's land within the unit under the Conservation Commissioner's order now in force, should be limited to the 9/16ths mineral interest owned by plaintiff when suit was instituted, * * *."
Evidently the Supreme Court was not impressed with defendant's contention for they rendered a judgment cancelling the entire lease.
Another contention made by defendants is that, even assuming there was a proper placing in default, plaintiff waived any prior default by executing and returning to the Atlantic Refining Company on September 29, 1956, a royalty division order which in effect was a consent by plaintiff to accept royalties tendered thereafter in the usual course of business. When confronted with a similar argument made by defendants in Broussard v. Phillips Petroleum Company et al., D.C., 160 F.Supp. 905, the Federal District Court (Western District) correctly applied Louisiana law in stating the following:
"The last defense raised by defendants is that plaintiff `retained' royalty checks from the Commissioner's unit affecting the outside acreage (which was established several months subsequent to October 19, 1956) and that he is estopped to urge the forfeiture of the lease.
"It should be observed that defendants retained the checks; he has not cashed the checks. There is no allegation that such acts or course of conduct by plaintiff was relied on by defendants or that defendants changed their position or did anything detrimental to their position because of said conduct. These are essential and vital elements to a plea of estoppel, and the failure of defendants to allege them is fatal to that plea. See State ex rel. Porterie v. Gulf, M. & N. R. Co., 1938, 191 La. 163, 184 So. 711; Brock v. Black Rogers & Co., Ltd., 1942, 201 La. 1017, 10 So.2d 790. Also New La. Digest, Estoppel, and 25 and numerous cases cited there.
"Further, there simply are no authorities supporting defendants in this position; in fact, there are many authorities to the effect that estoppel is not appropriate in these circumstances.
"In Wilcox v. Shell Oil Company, 1954, 226 La. 417, 76 So.2d 416 the court held that the execution of royalty division orders and the cashing of royalty checks did not estop the plaintiff from suing for forfeiture of the lease for non-payment of rentals. Louisiana Live Stock and Planting Company v. Kendall, 1924, 155 La. 122, 98 So. 862, 863, is authority for the proposition that a plea of estoppel is not applicable nor appropriate after the right of forfeiture has already accrued. There it was declared that the portion of a lease provided for the production of oil from an existing well on the premises and the monthly payment of royalties therefore was independent of the requirement that a new well be drilled within one year. And, although the Court referred to the receipt of royalties by the plaintiff from the well the lessee was required to operate as one of the considerations of the lease, it was held that the acceptance of such royalties after the accrual of the right of forfeiture for failure to drill the new well `could not possibly operate as an estoppel', nor could it in any other manner affect plaintiff's right to take advantage of his right of forfeiture."
*24 The most important question before this court is whether or not the delay in royalty payments from April 2, 1956 to October 29, 1956 was excusable or reasonable under the facts and circumstances of this case.
This was not a "wild cat" well; in fact, it was a well drilled in a temporary unit (in the Live Oak Field of Vermilion Parish) formed by the conservation department in its order No. 300-A effective May 1, 1955. Therefore, prior to, and certainly from May 1, 1955 it seems that Houston Oil Company (defendant's transferor) knew that Live Oak Gas Unit IV would be drilled with high probable production results. It, therefore, had eleven (11) months to do title work before the well was placed on production April 2, 1956. Whether it did or did not certainly should not be blamed on plaintiff. After the well was placed on production it had until sometimes in June some three (3) additional months to get its title opinion and make royalty payments. It is common knowledge and accepted custom that most titles are checked and curative work completed prior to the commencement of drilling operations; defendant was afforded additional protection, for the lease expressly provides that lessee is not obliged to take cognizance of any transfers of interest in leased premises unless furnished with certified copies of recorded instrument forty-five days before due date of royalty (paragraph No. 8). The pertinent paragraph reads as follows:
"8. The rights of either party hereunder may be assigned in whole or in part, and the provisions hereof shall extend to the heirs, successors and assigns of the parties hereto, but no change or division in ownership of the land, rentals or royalties however accomplished shall operate to enlarge the obligations or diminish the rights of lessee; and no such change in ownership shall be binding on lessee nor impair the effectiveness of any payments made hereunder until lessee shall have been furnished, forty-five (45) days before payment is due, a certified copy of recorded instrument evidencing transfer, inheritance, sale, or other change in ownership. In event of assignment of this lease as to a segregated portion of said land, the rentals payable hereunder shall be apportionable as between the several leasehold owners ratably according to the surface area of each, and default in rental payment by one shall not affect the rights of other leasehold owners hereunder. * * *" (Tr. 135)
This provision has been recognized and upheld by the Supreme Court in Pearce v. Southern Natural Gas Company, 220 La. 1094, 58 So.2d 396 and Atlantic Refining Company v. Shell Oil Company, 217 La. 576, 46 So.2d 907. Therefore, with the title opinion that it had or should have had between May 1, 1955 and April 2, 1956, there should not have been more than a reasonable time for such payment. No evidence was shown as to receipt of such certified copies or reasonable dispute as to those entitled to receive the royalties, or the amount due each in the designated unit. Therefore it certainly seems that no justifiable cause for delay has been shown.
In paragraph No. 5[3] of the lease, provisions are made for three months time for resumption of rentals after dry hole or from cessation of drilling operations. Now, *25 in sub-paragraph (c) of paragraph 3[4] of the lease, provisions are made for the payments of shut-in royalties at the rate of $500.00 per year, payable quarterly. The purpose of these provisions is to grant lessee sufficient time to determine royalty owners and to pay within three months. It is also commonly known that shut-in royalties are paid in the same manner as rentals, that is, on or before the date due, or else the lease ceases to be in force. The contract is one furnished by the company-lessee; the clauses contained therein are devised by the lessee, who could very well have inserted a clause to extend delays for payment of first or initial royalties. There being no such provision, then necessarily the laws of the State must govern. Lessee is bound to pay the rental at the terms agreed upon. L.S.A.-C.C. Article 2710. In absence of the manner of payment, custom and usage must be relied upon and, from custom and usage and facts of this case, royalties are payable monthly. In construing mineral leases, codal provisions applicable to ordinary leases must be applied. The payment of rent, in pursuance of the terms of the contract of lease, is an essential engagement on the part of the lessee, and his noncompliance with it gives to the lessor a right to sue for the dissolution of the contract.
We are in agreement with defendants' argument that it is recognized that in certain cases the right to dissolve a lease for failure on the part of the lessee to pay the rental promptly when due is subject to judicial control according to the circumstances, however, we also agree with the plaintiff that the rights of the lessor to collection of his rent or royalty cannot be jeopardized by the "large" transactions and/or whims of the lessee. The Atlantic Refining Company claims that it purchased the very large oil and gas interests from Houston Oil Company which caused extensive bookkeeping problems and, therefore, under the circumstances, the delay was certainly excusable. It is rather difficult to understand how this purchase legally changes the position and/or rights of the lessor. Atlantic merely took the place of Houston Company, and if Houston Company had permitted 18 months to elapse without payment of rentals, would the purchasing Atlantic be in a position to say that it should be allowed another eight months to get its business straight? If, under the circumstances, the bookkeeping "problem" became so burdensome, then defendant should have simply hired additional personnel to take care of the anticipated increase workload, or suffer the consequence. The subsequent bookkeeping problems of the mineral lessee should not operate as a penalty against the lessor, particularly after it had been known by Atlantic that the lessor was demanding his royalties. When confronted with a similar situation, the Court in Bailey v. Meadows, stated:
"The reasons for the delay, as given by the appellees, do not favorably impress us. The appellants, as lessors, were not a party to any of these negotiations between the appellees and the operator. Regardless of the final outcome of such negotiations, the amount due the appellants would be the same. The negotiations in question were being held exclusively for the benefit of the appellees, as lessees, and the Southern Natural Gas Company, as the operator. In other words, when the acreage was placed in the unit by the order of the Conservation Department, the status of the appellants, as lessors under the original oil and gas leases, did not change. Neither was the status of the appellees as lessees altered, except they were relieved of the obligation to drill a well in order to secure production, because this was *26 obtained by including the acreage within the existing production unit. Under these circumstances, the lessees were required to negotiate with Southern Natural Gas Company as to the payment of their pro rata part of the drilling of the original well. Until such an agreement was consummated, we must assume the seven-eights interest in the production which would ordinarily have been paid to the appellees would be withheld by the operator. But to say the appellees could withhold payment of the royalties due the appellants until such negotiations were made to their satisfaction, would be equivalent to saying the lessees were not obligated to pay the lessors any royalties until they were paid their portion.
"If the negotiations in question made it impossible for them to pay that portion of the production due the appellants as the lessors, we feel the burden was upon appellees to so show. * * * We have concluded this record does not show how the negotiations between the appellees and the operator could have in any way affected the amount due the appellants."
Defendants further contend that if they have violated their obligation to pay royalties, such violation is nothing more than a passive violation so that no suit thereon can be maintained without defendants having been put in default and that the defendants were not adequately put in default. The trial court apparently accepted this argument, for in its JUDGMENT, it stated:
"The argument that the Melancon case held that it was not necessary to place a lessee in default for non-payment of the royalty is not well taken. As pointed out above, there was the specific finding in that case that there was active default and breach of the contract of lease. The fundamental rule as announced in Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583; Temple v. Lindsay, 182 La. 22, 161 So. 8; Pipes v. Payne, 156 La. 791, 101 So. 144; and Billeaud Planters v. Union Oil Company of California, 5 Cir., 245 F.2d 14, has not been abrogated, and until these cases are expressly overruled, they will remain controlling in the Court."
We believe that the trial court erred in the instant case, for in the Melancon case the Supreme Court stated:
"Defendant's contention that there was no `formal demand,' that such demand is a necessary preliminary to a refusal to pay, and that in its absence the forfeiture would not be warranted, is not persuasive in the face of the finding of the trial judge, and of our confirmation of his finding, of the defendant's active violation of its obligations under the lease. LSA-Civil Code, Article 1932; [footnote omitted] Rosenthral v. Baer, 18 La.Ann. 573; Noel Estate, Inc. v. Louisiana Oil Ref. Corp., 188 La. 45, 175 So. 744. But if it were necessary to place the defendant in default because of the fact that the exact time for payment of royalties was not fixed in the subject contract, we are not unmindful of the provisions of the Civil Code that placing a debtor in default may be accomplished verbally, in the presence of two witnesses, Article 1911, and the record, we think, clearly supports the trial judge's finding that the plaintiff asked for payment of production royalties at least three times, at meetings attended by others and in their presence." (Emphasis added.)
The defendants in Bailey v. Meadows, supra, made an argument similar to that of defendants in the instant case. The court correctly disposed of their contentions by the use of the following language:
"The appellees additionally contend that if it be conceded there was no legal justification for the refusal to pay royalties, it was necessary to put *27 them in formal default before an action could be instituted for cancellation of the leases. In this connection, the record reflects the leases under consideration are the usual commercial type with no fixed time for the payment of production royalties and no specific provision for the cancellation of same for the failure to pay royalties. Of course, interrelated to the basic question of default is the subsidiary issue of whether the breach involved herein was `passive' or `active'.
"A study of the numerous oil and gas cases dealing with the dissolution or cancellation of leases for non-development show the relation between the LSA-Civil Code articles on default with those on dissolution or cancellation. The case of Temple v. Lindsay, 1935, 182 La. 22, 161 So. 8, 12, held the owner of an oil and gas lease could not sue for the dissolution of a contract under which the defendant agreed to drill an oil well `with due and reasonable diligence' without first putting the defendant in default. The contract in that case, as in this case, specified no term for the performance of the obligation.
"The Supreme Court, in the case of Pipes v. Payne, 1924, 156 La. 791, 101 So. 144, held that the lessor, before suing to have an oil lease forfeited for failure to drill additional wells, should have made demand on lessee to further develop the property; and should have given a reasonable time within which to act; and that a petition to forfeit an oil lease for failure to further develop land did not disclose a cause of action in the absence of an allegation of formal default. This case held such a demand for further development was necessary under Article 1912 of the LSA-Civil Code, although a demand was made for cancellation under Act 168 of 1920.
"We have been cited to numerous other cases wherein the cancellation of a lease was sought because of failure to adequately develop the property. In all such cases, the courts have generally held that a default is a condition precedent to such an action. Appellees argue it logically follows that a default is a prerequisite to a cancellation of a lease for failure to pay accrued production royalties.
"Essentially ours is the problem of determining whether the breach involved herein was an active or passive breach. In this regard, we note the following articles of our LSA-Civil Code:
"Article 1931.
"`A contract may be violated, either actively by doing something inconsistent with the obligation it has proposed or passively by not doing what was covenanted to be done, or not doing it at the time, or in the manner stipulated or implied from the nature of the contract.'
"Article 1932.
"`When there is an active violation of the contract, damages are due from the moment the act of contravention has been done, and the creditor is under no obligation to put the debtor in default in order to entitle him to his action.'
There have been numerous cases interpreting the above codal article and particularly as they relate to oil and gas leases. All of such decisions culminated in the landmark cases of Melancon v. Texas Company, 1956, 230 La. 593, 89 So.2d 135, and Bollinger v. Texas Company, 1957, 232 La. 637, 95 So.2d 132. In the Melancon case, cancellation of a lease was awarded to lessor because of failure of lessee to pay production royalties for a period of fifteen months. After reviewing numerous cases to the effect that lessor's royalty under the usual oil and gas lease is placed in the rent category, and *28 that in construing mineral leases the codal provisions applicable to ordinary leases must be applied, the Supreme Court stated [230 La. 593, 89 So.2d 142]:
"`In the system of interpretation of oil and gas contracts which this Court has followed for many years, the lessor's royalty under the usual oil and gas lease is placed in the rent category. Such a characterization is well fixed in our law (see Milling v. Collector of Revenue, 220 La. 773, 57 So.2d 679, containing a summary and analysis of pertinent cases), and has given little trouble since this Court's pronouncement of more than three decades past that * * * "a mine or quarry, or land adapted to mining or quarrying, may be leased for a certain portion of the produce of such mine or quarry, and the fact that such portion is called `royalty,' instead of rent, is not of the least consequence." Logan v. State Gravel Co., 158 La. 105, 109, 103 So. 526, 527. The rule is equally well established that in construing mineral leases, "* * * the codal provisions applicable to ordinary leases must be applied." Coyle v. North American Oil Consolidated, 201 La. 99, 114, 9 So.2d 473, 478; Tyson v. Surf Oil Co., 195 La. 248, 196 So. 336. * * *
"`In the case of royalty based on gas and oil production it is the accepted custom, as reflected by this very record, to make such payments on a monthly basis, computed on the amount of gas and oil sold or run into the line from the well. A justifiable cause for delay in such payments might arise when there is a reasonable dispute as to those entitled to receive the royalties, or the amount due each, but no such factual situation is here presented, and we agree with the trial judge that a delay of fifteen months for no valid reason is unjustifiable and violative of the terms of the contract.

* * * * * *
"`Defendant's contention that there was no "formal demand," that such demand is a necessary preliminary to a refusal to pay, and that in its absence the forfeiture would not be warranted, is not persuasive in the face of the finding of the trial judge, and of our confirmation of his finding, of the defendant's active violation of its obligations under the lease. LSA-Civil Code, Article 1932; Rosenthral v. Baer, 18 La.Ann. 573; Noel Estate Inc. v. Louisiana Oil Ref. Corp., 188 La. 45, 175 So. 744. But if it were necessary to place the defendant in default because of the fact that the exact time for payment of royalties was not fixed in the subject contract, we are not unmindful of the provisions of the Civil Code that placing a debtor in default may be accomplished verbally, in the presence of two witnesses, Article 1911, and the record, we think, clearly supports the trial judge's finding that the plaintiff asked for payment of production royalties at least three times, at meeting attended by others and in their presence.' (Emphasis supplied by this Court.)
"In the companion case of Bollinger v. Texas Company, supra, cancellation of a lease was granted to a lessor, whose property was located in the same unit as that of Melancon, on the ground that, although plaintiff was paid a sum for `shut-in' royalties in excess of the amount due as production royalties, the lessee should have paid the correct amount due as production royalty. We feel the following language from that case is applicable to the instant case [232 La. 637, 95 So.2d 136]:
"`Plaintiff urges that it is not the amount of the royalties which is determinative of the right of cancellation and forfeiture, but that it is the failure on the part of the Lessee to pay any amount of production royalties without a proper excuse for such non-payment.

*29 "`In the Melancon case, supra, we held that the codal provisions which apply to ordinary leases are also applicable to mineral leases; and that in the case of royalty based on gas and oil production, it is the accepted custom to make such payments on a monthly basis, computed on the amount of gas and oil sold or run into the line from the well. We further stated that a justifiable cause might exist for delay in such payment, when there is a reasonable dispute as to those entitled to receive the royalties. In the instant case, the record discloses that there was no dispute as to those to whom royalties were due.

* * * * * *

"`A Lessee must comply with his lease terms. Whether production payments are larger or smaller than "shut-in" payments, they must be paid on accurate computations and as such. Plaintiff had the right to be paid in accordance with the method provided by the terms of the leasenot at the whim or caprice of the defendant. Where the whim of defendant could or might affect a Lessor's rights under a lease, courts should always (as we are doing here) intervene to protect those rights.' (Emphasis partially supplied by this Court.)
"Appellees contend the Melancon and Bollinger cases are clearly distinguishable from the instant case on the facts and the language used. We must confess the court said in the Melancon case that the facts therein justified finding a formal demand had been made `if it were necessary', but this was pure surplusage and dictum. We are also mindful that the court found the refusal to pay the royalties in the Melancon case was a part of an apparent scheme to pressure or force the lessors into signing a unitization agreement. However, such a finding by the court did not alter the clear and unmistakable principles of law enunciated in its opinion, from which we have extensively quoted. [Emphasis supplied by this court.]
"We are, therefore, of the opinion that the Melancon and Bollinger cases have enunciated a general rule that failure to pay production royalties under an oil and gas lease, for any appreciable length of time, without justification, amounts to an active breach of such lease which entitles the lessor to a cancellation thereof without the necessity of placing the lessee in formal default. * * *" [Emphasis added by this court.]
We do not mean to hold that a land-owner-lessor is entitled to cancellation of a mineral lease simply because the lessee fails to tender the initial royalty payments. In the instant case, a drilling unit was set up as early as May 1, 1955 and a well was completed on April 2, 1956. Despite the repeated efforts by plaintiff's attorney to secure timely payment of royalties the royalty payments were not mailed out until about October 30, 1956.
After considering all the facts and circumstances of this case, we are of the opinion that defendants' failure to timely pay production royalties under the parties' mineral leases was not excusable and was without justification, therefore we are of the opinion that the lower court was in error in rejecting the demands for cancellation of the leases.
Plaintiff's petition demands $15,000 as reasonable attorney's fees. In the absence of evidence in the record as to the value of such reasonable attorney's fees, cf., Melancon v. Texas Co., 230 La. 593, 89 So.2d 135 (syllabi 16, 17), or of a finding by the trial court under the eye of which the services were performed as to the reasonable valuation thereof, cf., Thigpen v. Thigpen, 231 La. 206, 91 So.2d 12 (syllabus 29) this appellate court will nonsuit plaintiff's claim in this regard.
For the reasons stated herein, the judgment of the lower court is reversed and set aside, and it is now accordingly:
*30 ORDERED, ADJUDGED AND DECREED:
That there be judgment herein in favor of Casey Pierce, and against the defendants, The Atlantic Refining Company, Texaco-Seaboard, Inc., Henry Oil Company, Inc., Filiorum Corporation of Delaware, Araho Corporation, First Oil Payments, Inc., United States Steel and Carnegie Pension Fund, Houston Payment Company, Pension Holding Corporation, Scarborough Properties Corporation, Gateway Oil Corporation, Bethpen Investment Corporation, Fidelpen Corporation, Inscona Corporation and the Trustees of Princeton University;
That the oil, gas and mineral leases described in plaintiff's petition (and affecting the land described in this opinion) are hereby declared and decreed to be null and void, and it is hereby ordered that said leases be cancelled and erased from the records of the Parish of Vermilion;
That Atlantic Refining Company and Seaboard Oil Company of Delaware account to petitioner for seven-eighths of the oil produced from said leases from October 24, 1956 and also render an account to petitioner (or make same available to him) all production from his leases from beginning to date;
That Transcontinental Gas Pipe Line Company account for and pay to plaintiff all gas collected, purchased and attributed to the leases described herein from production in the Gaston Hebert Well from October 24, 1956; and
That defendants pay all costs.
Reversed and rendered.
TATE, J., concurs with written reasons.
CULPEPPER, J., dissents and assigns written reasons.
TATE, Judge (concurring).
Stripped of all technical legal verbiage and theory, the issue in this case is whether the defendant producer delayed an unreasonably long time in its tender of the oil royalties due to the landowner-lessor under the mineral lease. The majority held that the defendant producer's failure to tender any of these royalties due for seven months after the completion of a producing well is an unreasonably long delay, in the absence of any satisfactory explanation for it by the defendant-producer, occupying the status of a lessee under the lease.
I do not think that the landowner is obliged to prove that the delay in question was unreasonable according to the custom of the industry. The lease does not state that the producer is entitled to withhold the royalty rentals due for any period of time. Under the literal terms of the lease, the producer owed the landowner his royalties as rent for the use of his resources from the moment the oil was produced or that the producer realized the proceeds of production. If, as is the case here, the producer relies on a custom of the industry entitling it to longer delay in tendering these initial royalties (thus deeming it to have been written, as an implied additional agreement, into the terms of the lease confected in reliance thereupon), then the producer has the burden of proving same, since under the literal terms of the lease these royalties are due at once.
Further, the custom of an industry may well be a very relevant factor in determining whether conduct was reasonable under the circumstances, but, actually, the customary way of doing things does not conclusively establish the standard of what is reasonable conduct; the custom and usage of an industry may be deficient insofar as the standard of duty reasonably owed to the general public, Cf. Harris Drilling Co. v. Delafield, 222 La. 416, 62 So.2d 627, 629-630; Casanova v. Paramount-Richards Theatres, 204 La. 813, 16 So.2d 444, 447-448. In the final analysis, it is up to the courts to determine whether, in the light of all the circumstances, the delay in tendering royalties was or was not unreasonable, when the agreement between the parties *31 does not expressly or in the contemplation of both parties provide for a given period within which to do so.
By proving so long a delay as seven months, the landowner has in my opinion established a prima facie case of unreasonable failure to tender timely to him the royalties undoubtedly due to him. And, although the several requests of his attorney for attention to the duty to pay the landowner his royalties may not, in a technical sense, have constituted formal demand upon the lessee because the earlier requests were not in writing or because the last request was misaddressed in its original (although a copy was received by the field office with supervision of the well in question), a factor in my considering that the delay in tendering royalties was unreasonable, in this borderline situation, is the refusal of the producer to accord any attention to or to expedite consideration of this landowner's several requests for payment of the royalties due him.
Had the producer-lessee produced proof that it could not efficiently tender royalties within the period shown because its delay was reasonably excused by special circumstances or factors outside of its control, the conclusion of the majority would undoubtedly have been different. Inferentially, the defendants recognize the delay was overlong, in producing evidence that the delay resulted from the sale of the producing interests after production by the original producer-lessee to the present operator of the leases. But, and I think all members of the panel agree on this, financial dealings or disputes between the lessee-interests cannot prejudice the right of the landowner-lessor to receive his royalties promptlythe landowner-lessor's right to prompt payment of his royalties cannot be disregarded, but must be protected, in transactions within the lessee interests. See Bailey v. Meadows, La.App. 2 Cir., 130 So.2d 501, certiorari denied.
Ultimately, I am forced, somewhat reluctantly in view of the harsh penalty of cancellation, to conclude that we cannot say that the unexplained failure of the lessee to tender royalties for more than half a year after the producing well is brought in, can be held to be a reasonable delay, especially in view of the several requests by the landowner for expedition of payment of the royalty due him. If we hold otherwise, producing interests may reasonably conclude that they have a license to delay the payment of royalties for this long or longer and that without penalty they can ignore the landowner's requests for more prompt payment to him of what, actually, is his money, which the producer is retaining for its own use during the interval.
I am also influenced by the circumstance that mineral leases are usually prepared and written by the lessees, and ambiguities or obscurities in such instruments should be construed against them. If seven months was desired for the time within which leisurely to attend to payment to the landowner of royalties due him, then a standard lease clause to such effect should have been prepared and contained in the lease agreement. In the absence of same, it is for the courts to determine whether the delay in tendering royalties for more than half a year after production was a reasonable compliance with the terms of the lease, or was so unreasonable a delay as to constitute an active breach thereof. Under the circumstances here shown, the unexplained failure to do so within seven months was, in the opinion of the majority, an unreasonable and unexcused appreciable delay in the fulfillment of the lease obligations, therefore entitling the landowner to cancellation of the lease.
CULPEPPER, Judge (dissenting).
I cannot agree with the majority opinion. I take it as fundamental in our law that "not doing what was covenanted to be done" is only a passive violation of a contract. LSA-C.C. Art. 1931. Furthermore, when the breach of a contract has been *32 passive only, a putting in default is required. LSA-C.C. Art. 1933. As applied to oil and gas leases in particular the general rule is well established in our jurisprudence that the failure to perform an obligation in such a contract is a passive breach requiring a putting in default. Brown v. Sugar Creek Syndicate, 195 La. 865, 197 So. 583; Pipes v. Payne, 156 La. 791, 101 So. 144; Billeaud Planters v. Union Oil Company of California, 245 Fed.2d 14; Touchet v. Humble Oil & Refining Co., D.C., 191 F.Supp. 291.
I agree with the trial judge that the cases of Mclancon v. Texas Company, 230 La. 593, 89 So.2d 135, its companion case, Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132, and Bailey v. Meadows, 130 So.2d 501 (2nd Cir.App., writs of certiorari denied) recognized the above stated general rule of law but concluded, under the peculiar facts in each case, that there was an active breach. In the Melancon case, where the first royalties were not paid for fifteen months after production, the Supreme Court found that there had been an active breach because "The non-payment of royalties by the defendant was not the result of negligence or inadvertence, but of studied and positive nonfeasance designed and intended to pressure the plaintiff into the acceptance of an enlarged production unit contrary to his expressed desires and the terms of the contract." In the Bailey case, where the first royalties were not paid for eighteen months, and the sole excuse offered by the lessee was that it was negotiating a dispute with the operator as to the pro rata share of production costs, the court found this was an active breach because "failure to pay production royalties under an oil and gas lease, for any appreciable length of time, without justification, amounts to an active breach of such lease which entitles the lessor to a cancellation thereof without the necessity of placing the lessee in formal default." (Emphasis supplied.) I therefore cannot agree with the implication in the majority opinion that the Melancon, Bollinger and Bailey cases have removed from our law the requirement of a putting in default, where the breach has been passive only.
Under the evidence in the instant case there was no putting in default. Some contradictory evidence on this issue was introduced but the trial judge found that plaintiff had not put defendants in default. The majority opinion in this court does not contend there was a putting in default. There being no putting in default, plaintiff must show an active breach. As I understand the majority opinion, it is essentially based on the theory of the Bailey case, supra, that "the failure to pay production royalties under an oil and gas lease for any appreciable length of time, without justification, amounts to an active breach." (Emphasis supplied.) In the Bailey case the court had considerable difficulty in concluding that eighteen months was a sufficiently "appreciable length of time" to amount to an active breach, but in the instant case the delay was only seven months and there is absolutely no evidence in the record to show that such delay was unreasonable in this case or beyond the customary time. Actually, the plaintiff in the instant case did not put on a single witness to prove what is a reasonable or customary time. Plaintiff simply attempted, by cross-examining defendants' expert witnesses, to prove this essential fact in his case. Defendants' three expert witnesses, two of whom were employees of other oil companies, testified that the time lapse, between the start of production and the first royalty payment, varies in each particular case according to the amount of administrative and title details required. They outlined the customary procedure as follows: When a well is first brought in, the lessee obtains supplemental abstracts of title, because there are usually a number of mineral and royalty transactions filed immediately before and during the drilling operation. Next, the supplemental abstract is sent to attorneys for a title opinion. Then any title corrective work necessary must be done. Next, a division order must *33 be prepared and mailed out. When most of the signatures have been obtained on the division order, the proper bookkeeping must be set up for a monthly payment of royalties. The expert witnesses testified, I think with logic and reason, that in view of this necessary and customary procedure there is no definite or usual delay before which the first royalty payments are made. One important factor would be the number of royalty owners and in the instant case the evidence shows there were about 75 such owners.
I agree with the majority opinion, and the Bailey case, supra, that the time consumed by the defendant, The Atlantic Refining Company, with administrative and bookkeeping details resulting from its purchase of these and other oil properties from Houston Oil Company, cannot be used as an excuse for delay in payment to royalty owners, but the record is absolutely void of any evidence to show that this made any appreciable difference in the time when the plaintiff received his first royalty check. The defendants' witnesses testified that their employees worked many hours overtime and that they secured additional personnel in order to expedite the royalty payments.
The reasoning in the majority opinion that Houston Oil Company, defendant's assignor, had eleven months between the establishment of the drilling unit and the time of production within which to do title work appears to me to be entirely irrelevant to this case. Defendant does not contend that any portion of the delay in paying plaintiff's royalty was caused by title work required for drilling. The only title work which the evidence shows had to be done after production was obtained, was as to the royalty owners. I do not see how the length of time that the lessee had, prior to drilling, to do title work has any bearing on the issues at hand.
Also, I cannot see the logic of the majority opinion contention that the lease provisions for payment of shut-in royalties at the specified amount of $500 per year to be paid quarterly, can be construed to mean that the lessor and the lessee "appeared to have recognized as a reasonable time for performance as three months." This provision of the lease has no bearing on the payment of production royalties, as to which no time for payment is specified in the lease agreement.
As I see it, the effect of the majority opinion is to establish a legal presumption that a delay of seven months between the completion of a well as a producer and the date of the first royalty payments is a sufficiently appreciable length of time to constitute an active breach of the lease agreement, which places on the lessee the burden of showing a justifiable cause for the delay. I agree that the Bailey case, supra, must be so construed where the delay is eighteen months, but there is a great deal of difference between eighteen months and seven months. I take it as well settled in our jurisprudence that forfeitures are not favored by the law. Peoples State Bank v. United States Fidelity & Guaranty Co., 164 La. 95, 113 So. 779; Schultz v. Texas & Pacific Railway Co., 191 La. 624, 186 So. 49; Morris v. Sovereign Camp, WOW, 203 La. 507, 14 So.2d 428. Certainly the evidence in the instant case is not sufficiently strong that this fundamental proposition of law should be ignored.
For the reasons assigned, I respectfully dissent.

On Application for Rehearing.
PER CURIAM.
Applications for rehearing have been filed by all defendants-appellees.
In its application, the Transcontinental Gas Pipe Line Company calls to our attention that in our original opinion we ordered it to "account for and pay to plaintiff all gas collected, purchased and attributed to the leases described herein from production in the Gaston Hebert well from *34 October 24, 1956; * * *". Transcontinental points out that the plaintiff's demand against it for an accounting is premature since, inter alia, there is no concrete evidence in the present record proving that some of the gas purchased by it from the Live Oak Field was attributable to the lands of the plaintiff. Considering all the circumstances reflected by the record, we are of the opinion that our original opinion herein should be amended so as to non-suit the demand of the plaintiff against the said defendant-appellee.
Having in our original opinion considered all other contentions raised by the other defendants-appellees, all applications for rehearing are denied. As thus amended, the original judgment of this court is reinstated.
Applications for rehearing denied.
CULPEPPER, J., is of the opinion a rehearing should be granted.
NOTES
[1] The term leases is sometimes hereinafter referred to simply as lease.
[2] It appears that these checks were actually mailed out sometime between October 29, 1956 and October 30, 1956; see letter (P. 13, Tr. 192) from Atlantic's Mr. Wm. S. Bicknell dated October 30, 1956.
[3] "5. If prior to discovery of oil, gas, sulphur or other mineral on said land, lessee should drill a dry hole or holes, thereon, or if after discovery of oil, gas, sulphur or other mineral, the production thereof should cease from any cause this lease shall not terminate if lessee commences operations for additional drilling or reworking within sixty days thereafter or (if it be within the primary term) commences additional drilling operations or commences or resumes the payment or tender of rentals on or before the rental paying date next ensuing after the expiration of three months from date of completion of dry hole or cessation of production. * * *" (Tr. 136)
[4] "3. (c) Where gas from a well producing gas only is not sold or used because of no market or demand therefor, lessee may pay as royalty $500.00 per well, per year, payable quarterly, and upon such payment it will be considered that gas is being produced within the meaning of Article 2 of this contract." (Tr. 135)