294 So.2d 518 (1974)
R. E. HIBBERT
v.
William MUDD et al.
No. 53271.
Supreme Court of Louisiana.
April 29, 1974.
*519 W. C. Hollier, Bailey & Hollier, Lafayette, for plaintiff-applicant.
James Domengeaux, Domengeaux & Wright, Lafayette, for defendants-respondents.
Lawrence K. Benson, Charles A. Snyder, Milling, Benson, Woodward, Hillyer & Pierson, New Orleans, William M. Hall, Jr., Liskow & Lewis; Lawrence E. Donohoe, Jr., Davidson, Meaux, Onebane & Donohoe, Lafayette, for amici curiae.
MARCUS, Justice.
In this concursus proceeding, R. E. Hibbert sought to determine the ownership of certain accrued production royalties under an oil and gas lease which had been executed in 1959 between Edna Mudd Anderson, as lessor, and himself, as lessee. The said royalties were deposited in the registry of the court at the time the concursus was filed. Edna Mudd Anderson died intestate on September 20, 1961 without legitimate ascendants, descendants or collaterals. *520 Production under the aforesaid lease commenced on December 9, 1961. A dispute arose as to the title to these royalties between lessor's collaterals. One group was allegedly from a miscegenous union (Mudd-Sinclair), and the other group from an adulterous union (Sinclair-Birrat). The latter groups, as well as the State of Louisiana, were impleaded in the concursus proceeding.
The State of Louisiana filed an answer claiming the property by escheat for want of any heirs. The Mudd-Sinclair claimants averred they were owners of record of the property by virtue of a judgment of possession dated December 5, 1961 and a transfer from the Sinclair-Birrat claimants. Coupled to that answer was a reconventional demand for cancellation of the Anderson lease because of Hibbert's failure to pay royalties to the reconvenors or to the estate of Edna Mudd Anderson during a nineteen-month period from commencement of production to the filing of the concursus.
In due course, Hibbert filed answer setting up as defenses that reconvenors had no standing or capacity to seek cancellation because they had never been recognized as lessor's irregular heirs by a contradictory proceeding in the form and manner provided by the codal articles dealing with irregular successions; that no demand for payment had been made on him nor had he been placed in default, which action was a condition precedent to an action to cancel under the unusual circumstances presented; and that the delay in payment was legally justified by a bona fide and unresolved dispute as to the ownership of the said royalties between the State of Louisiana and lessor's miscegenous and adulterous collaterals. In the alternative, if cancellation was decreed, Hibbert sought to invoke paragraph 3 of the lease providing that, in the event the forfeiture or cancellation for any cause, lessee would be entitled to retain unit acreage from the effects of cancellation.
Initially, the district court maintained a motion for summary judgment filed by the Mudd-Sinclair claimants as against the claims of the State of Louisiana. The matter was appealed, and the Court of Appeal reversed, holding there was a genuine issue of fact as to whether the Mudd-Sinclair unit was miscegenous. The cause was remanded for trial. 187 So.2d 503 (La.App.).
Following this remand, the district court rendered judgment in favor of the Mudd-Sinclair claimants as against the claims of the State. The demand for cancellation was granted on the finding that Hibbert would have been protected had he paid royalties to lessor's "estate" and that his failure to do so was in violation of R.S. 30:105 and was thus an active breach of the lease contract sufficient in law to serve as a basis for cancellation. The effect of cancellation was, however, limited to the non-unitized areas of the leased premises pursuant to the "forfeiture" provision incorporated as paragraph 3 of the lease, permitting lessee's retention of all that portion of the acreage included in units.
Hibbert appealed. The Mudd-Sinclair claimants answered the appeal, praying for amendment of the judgment so as to order cancellation of the Anderson lease in its entirety. The State and the Sinclair-Birrat claimants neither appealed nor answered the appeal. The Court of Appeal reversed the district court insofar as its decree permitted Hibbert to retain unitized acreage from the effects of cancellation, and, in all other respects, the judgment was affirmed. 272 So.2d 697 (La.App.). We granted certiorari. 274 So.2d 390 (La.).
As previously indicated, Edna Mudd Anderson died intestate on September 20, 1961, leaving no legitimate ascendants, descendants or collaterals. Hibbert completed a shut-in gas well on the Anderson lease on or about September 18, 1961. He testified that he learned of the lessor's death two days after completion of said *521 well. The succession of Edna Mudd Anderson was opened in the 15th Judicial District Court for the Parish of Lafayette, and, on December 5, 1961, the Mudd-Sinclair and Sinclair-Birrat claimants were recognized as the irregular heirs of the decedent and sent into possession of her property. No administrator was appointed or qualified. Under the terms of the ex parte judgment of possession, all monies and funds owed to the succession were ordered delivered to the attorney for the Mudd-Sinclair and Sinclair-Birrat claimants. The gas well completed on September 18, 1961 was placed on production on December 9, 1961, some four days after the ex parte judgment was signed.
After learning of the death of Mrs. Anderson as aforesaid, Hibbert testified that he telephoned the office of the law firm which had originally secured the Anderson lease for him and had rendered him a title opinion in connection therewith. Hibbert further stated that counsel was out of the office at the time and, after identifying himself, informed the lady who answered the phone that he desired the names of the heirs, if any, of Mrs. Anderson and requested a copy of the judgment of possession. Hibbert testified, and it was stipulated that he was never furnished with a copy of the judgment of possession.
Hibbert's testimony is that, since this same law firm had previously performed legal services for him in connection with this lease, it was his feeling that he was "in friendly hands" and that a copy of the judgment of possession would be furnished him in due course. While the record indicates that Hibbert did not know that this law firm represented the claimants in the succession proceedings, it does show he knew that they had represented the lessor at the time the lease was confected. The record also shows that this same law firm did in fact handle the succession proceedings and also represents the Mudd-Sinclair and Sinclair-Birrat claimants in this matter.
No demand for payment was made on Hibbert. However, on September 10, 1962, Hibbert received written demand for cancellation of the mineral lease involved in this suit. This was some eight or nine months after production. Thereafter, the parties entered into negotiations and exchanged correspondence over a period of the next ten months in an attempt to settle the title dispute to the royalties. Also, no demand for payment was made during this latter period. Ultimately, a compromise offer was made on July 9, 1963 which was rejected on July 19, 1963. On that date, Hibbert filed the concursus petition.
The alleged heirs claim that, despite the fact that production was established under the lease as of December 9, 1961, no payment of royalties was made or tendered prior to the institution of the concursus proceeding some nineteen months later.[1] Hibbert contends that the royalties in question were not paid because the lessor, Edna Mudd Anderson, died intestate in September of 1961, creating a title dispute between her alleged natural brothers and sisters and/or their descendants and the State of Louisiana.
Cancellation of the lease is sought for failure to pay production royalties for nineteen months without justification. It is contended that the failure in the instant case amounted to an active breach of the lease warranting the cancellation thereof without the necessity of placing lessee in default under the holdings in Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956); Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132 (1957); Bailey v. Meadows, 130 So.2d 501 (La.App.1961); *522 and Pierce v. Atlantic Refining Company, 140 So.2d 19 (La.App. 1962). The Court of Appeal so held. We reverse.
Very recently, we summarized the present jurisprudence in Wilson v. Sun Oil Company, 290 So.2d 844 (La.), Docket No. 52,764 on original hearing, handed down August 20, 1973, affirmed on rehearing, 262 La. 1164, 266 So.2d 446, February 18, 1974, as follows:
"Our jurisprudence has developed the rule that failure to pay production royalties under an oil and gas lease for any appreciable length of time without justification amounts to an active breach of such lease which entitles the lessor to a cancellation thereof without the necessity of placing the lessee in formal default. Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132 (1957); Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956); Fontenot v. Sunray Mid-Continent Oil Company, 197 So.2d 715 (La.App. 1967), cert. den.; Sellers v. Continental Oil Company, 168 So.2d 435 (La.App. 1964); Pierce v. Atlantic Refining Company, 140 So.2d 19 (La.App. 1962), cert. den.; Bailey v. Meadows, 130 So.2d 501 (La.App.1961), cert. den.
"However, in cases where the failure to pay production royalties is justified under the facts and circumstances, the breach is considered passive, requiring a putting in default. Broadhead v. Pan American Petroleum Corporation, 166 So.2d 329 (La.App. 1964), cert. den.; Fawvor v. United States Oil of Louisiana, Inc., 162 So.2d 602 (La.App.1964), cert. den. See also Alvord v. Sun Oil Company, 271 So.2d 561 (La.App.1972) and Hebert v. Sun Oil Company, 223 So.2d 897 (La.App.1969)."
No precise or exact period of time is considered either reasonable or without justification insofar as application of this rule is concerned. However, implicit in the above decisions is that, in determining whether payment of production royalties has been unjustifiably withheld, the courts must examine the facts and circumstances of each case. Here, the alleged justification for the delay in paying production royalties is based upon a bona fide title dispute. Mire v. Hawkins, 177 So.2d 795 (La. App.1965), affirmed 249 La. 278, 186 So.2d 591 (1966).
This Court indicated that a title dispute could justify delay in payment in the following language in Melancon:
"A justifiable cause for delay in such payment might arise when there is a reasonable dispute as to those entitled to receive the royalties, or the amount due each. * * *"
We have previously indicated that the claimants herein were issue of miscegenous and adulterous unions. At best, they were irregular heirs. Unlike regular heirs who enjoy seizin, and who succeed to ownership of the decedent's estate at the moment of death without benefit of formal proceedings (Article 944 C.C.), the doctrine "Le mort saisit le vif" does not apply to irregular heirs. Succession of Barber, 52 La.Ann. 960, 27 So. 363 (1900); Glenn v. West, 151 La. 522, 92 So. 43 (1922); Succession of Giordano, 188 La. 1057, 178 So. 627 (1938); Wimberly v. King, 179 So. 515 (La.App.1938).
An irregular heir has only a right of action to have himself placed in possession. Such an heir owns no interest in the property until contradictory proceedings are filed with other irregular heirs or claimants and a judgment secured recognizing him as owner. Article 949 Civil Code; Succession of Allen, 44 La.Ann. 801, 11 So. 42 (1892); Glenn v. West, 151 La. 522, 92 So. 43 (1922); Succession of Giordano, 188 La. 1057, 178 So. 627 (1938).
It is argued that Hibbert should have made payment to the estate or succession of Edna Mudd Anderson. Factually, under the peculiar circumstances of this case, there were no legal successors or heirs. Only irregular heirs existed whose claims were litigated over a period of years. No *523 administrator or other succession representative was ever appointed or qualified in the succession proceedings. Even if payment had been made by Hibbert, there was no person qualified to cash these checks. Thus, no one was deprived of the use of the funds during this period of time. We are satisfied that the facts clearly support Hibbert's contention that he did not pay royalties because he simply did not know who owned the land. The protracted litigation which followed is certainly evidence of the serious title dispute which existed and the legal issues which had to be resolved before payment could be made.
Accordingly, we conclude that, under the special facts and circumstances presented here, Hibbert was justified in his failure to pay production royalties during the period in question. This amounted to a passive breach of the lease contract requiring a placing in default. Reconvenors failed to place Hibbert in default.
We reject the Court of Appeal's conclusion that the lessee was not justified in withholding payment of royalties to the named lessor in spite of the title dispute in view of paragraph 9 of the lease.[2]
The provisions of paragraph 9 are solely for the lessee's benefit to relieve him of the unreasonable burden of constantly checking the public records for changes in ownership which may have occurred. See Pearce v. Southern Natural Gas Company, 220 La. 1094, 58 So.2d 396 (1952); Atlantic Refining Co. v. Shell Oil Company, 217 La. 576, 46 So.2d 907 (1950); and Garelick v. Southwest Gas Producing Company, 129 So.2d 520 (La.App.1961).
Our interpretation of this lease provision is that the lessee is protected under the provision not only as to the effectiveness of payments made without benefit of certified evidence of an ownership change, he is also protected against the imposition of any additional burdens resulting from such an ownership change until he receives certified evidence.
We do not find that this provision in the lease required Hibbert to make payment of royalties as here contended.
We also reject the contention that the withholding of royalties by Hibbert violated R.S. 30:105. In Mire v. Hawkins, 177 So.2d 795 (La.App.1965), it was held that this statute has no application where royalties are withheld because of serious unresolved title disputes. The Mire opinion correctly states:
"The plaintiffs do contend that by virtue of LSA-R.S. 30:105, 106, the mineral lessees breached an obligation of law to pay their lessors, the plaintiffs, production royalties due under the lease. The statutory provisions in question provide, inter alia, that it is unlawful for mineral lessees to withhold payment of royalties due to the lessor under a mineral lease from `the last record owner.' Here, however, it was necessary to resolve several then-unsettled close questions of law before it could be determined whether indeed the plaintiffs were still `record owners' by virtue of their apparently prescribed mineral servitudes, and for this reason among others we do not feel the statute was intended to apply to the type of situation instanced by the present facts."
*524 For the reasons assigned, the judgments of the Court of Appeal and the trial court are reversed; the appellees claim for lease cancellation is denied; and the case is remanded to the trial court for action consistent herewith.
BARHAM, J., concurs and dissents in part with reasons.
DIXON, J., dissents in part and concurs in part, joining in Justice BARHAM'S reasons.
CALOGERO, J., concurs.
BARHAM, Justice (concurring in part, dissenting in part).
Contrary to the jurisprudence cited by the majority, I am of the opinion that a suit for dissolution of a mineral lease on the grounds of delay in payment of royalty, or for any resolutory condition giving rise to dissolution, does not require a putting in default. I am of the further opinion that the majority's inquiry as to whether or not there has been an "active" or a "passive" breach of the lease is unimportant to a determination of the merits of a suit for dissolution of the lease.
Civil Code Article 1912 provides:
"The effects of being put in default are not only that, in contracts to give, the thing, which is the object of the stipulation, is at the risk of the person in default; but in the cases hereinafter provided for it is a prerequisite to the recovery of damages and of profits and fruits, or to the rescission of the contract." (Emphasis here and elsewhere supplied).
Civil Code Article 1932 provides:
"When there is an active violation of the contract, damages are due from the moment the act of contravention has been done, and the creditor is under no obligation to put the debtor in default, in order to entitle him to his action."
Civil Code Article 1933 provides:
"When the breach has been passive only, damages are due from the time that the debtor has been put in default, in the manner directed in this chapter."
An examination of the cases "hereinafter provided for" under Article 1912 results in a finding of a total absence of any such provisions for "rescission of the contract" under the resolutory condition of the failure of an obligor to "comply with his engagements." C.C. Arts. 2046, 2047. Professor J. Denson Smith has exhaustively and with great clarity made apparent the jurisprudential error of requiring putting in default prior to suit for a rescission of a mineral lease. J. Denson Smith, The Cloudy Concept of Default, Twelfth Annual Institute on Mineral Law, p. 3 (1965). Professor Smith states, at p. 9:
"By the express terms of Article 2046, with stated exceptions, the whole subject of resolution for non-performance rests within the discretion of the court. This is the basic reason why a putting in default should not be counted as necessary prior to institution of a suit for resolution, with or without damages. A judicial demand for resolution informs the defendant in the most unmistakable way that he must either offer to perform, or ask for further time, or submit some adequate defense, otherwise judgment will be rendered against him. It therefore gives him the chance to tender performance or to seek additional time within the discretion of the court. In view of this, the supposed necessity for a precedent warning is fanciful. * * *"[1]
Civil Code Articles 2046 and 2047 set forth the conditions for a judicial demand for resolution. Civil Code Article 2046 states:
"A resolutory condition is implied in all commutative contracts, to take effect, *525 in case either of the parties do not comply with his engagements; in this case the contract is not dissolved of right; the party complaining of a breach of the contract may either sue for its dissolution with damages, or, if the circumstances of the case permit, demand a specific performance."
Civil Code Article 2047 provides:
"In all cases the dissolution of a contract may be demanded by suit or by exception; and when the resolutory condition is an event, not depending on the will of either party, the contract is dissolved of right; but, in other cases, it must be sued for, and the party in default may, according to circumstances, have a further time allowed for the performance of the condition."

Some of the earlier cases recognized that a suit for dissolution under the resolutory condition of failure to perform did not require a prior putting in default. School Directors v. Anderson, 28 La.Ann. 739 (1876); Murray v. Barnhart, 117 La. 1023, 42 So. 489 (1906); Jennings-Heywood Oil Synd. v. Houssiere-Latreille Oil Co., 119 La. 793, 44 So. 481 (1907). In the last cited case, Justice Provosty, on rehearing wrote:
"That is to say, when the contract has been violated by the thing covenanted to be done not having been done within the time stipulated, the contractee acquires the right to have it rescinded, and does not have to call upon the defaulted contractor to perform it. The rationale of the matter is clear. The contractor knows what his contract is. He knows that it is to be fulfilled within a certain time; and if, without good excuse, he fails to perform it, he violates it, and is no longer in a position to call upon his contractee to perform his part.
"Article 1912, Civ.Code, in no wise conflicts with what is here said. It is found in section 2 of chapter 3 of the Code, under the rubric `Of the Obligation of Giving.' It reads as follows:
'The effects of being put in default are not only that in contracts to give the thing, which is the object of the stipulation, is at the risk of the person in default; but in the cases hereinafter provided for it is a prerequisite to the recovery of damages and of profits and fruits, or to the rescission of the contract.'
"That article does not say that default is in all cases a prerequisite to the action of rescission (which is the contention now made by plaintiff), but that it is such `in the cases hereinafter provided.' Hereinafter, where? In the entire subsequent portion of the Code? No; if that had been the idea, the language would have been `in all cases'; but `in the cases hereinafter provided'i. e., in this section. This was the view taken by this court in Murray v. Barnhart, supra, cited, and the court adheres to it."
However, in the cases of Melancon v. Texas Company, 230 La. 593, 89 So.2d 135 (1956) and Bollinger v. Texas Company, 232 La. 637, 95 So.2d 132 (1957),[2] the Supreme Court confused the requirement under Civil Code Articles 1932 and 1933 of putting in default in order to claim damages with the action for rescission of the lease. There it was said that a putting in default is a precedent condition to a suit for rescission of a mineral lease if there had only been a "passive breach" by the lessee. Articles 1932 and 1933 have nothing to do with the resolutory condition in every contract to rescind, or to sue for rescission, when there has been non-performance on the part of one of the obligors. Articles 1932 and 1933 do not even have application to the compensatory damages which may be claimed along with a suit for rescission. These articles were designed for the purposes of determining *526 when an obligor was "in mora" so that the other party could claim moratory or delay damages for losses resulting from the failure to get performance timely, while requiring the contract to be performed.
Following Melancon and Bollinger, supra, the appellate courts in a long line of cases have always first determined whether there was an active or a passive breach of the lease to see if a putting in default was required before suit for dissolution could be had. They have held an active breach of a lease entitles the lessor to a cancellation of a lease without the necessity of placing the lessee in formal default. Fontenot v. Sunray Mid-Continent Oil Company, 197 So.2d 715 (La.App.3d Cir. 1967) certiorari denied; Sellers v. Continental Oil Company, 168 So.2d 435 (La.App.3d Cir. 1964); Pierce v. Atlantic Refining Company, 140 So.2d 19 (La.App.3d Cir. 1962), certiorari denied; Bailey v. Meadows, 130 So.2d 501 (La.App.2d Cir. 1961) certiorari denied. They have held where the breach is considered passive, a putting in default is a prerequisite to dissolution. Broadhead v. Pan American Petroleum Corporation, 166 So.2d 329 (La.App.3d Cir. 1964), certiorari denied; Fawvor v. United States Oil of Louisiana, Inc., 162 So.2d 602 (La.App.3d Cir. 1964), certiorari denied. See also Alvord v. Sun Oil Company, 271 So.2d 561 (La.App.2d Cir. 1972) and Hebert v. Sun Oil Company, 223 So.2d 897 (La.App.3d Cir. 1969).
Recently, in Wilson v. Sun Oil Company, 290 So.2d 844 (La.1974) on first hearing, our Court approved this line of jurisprudence. I believe that we were in error not in result but in articulation of the rationale for the result in those cases. I conclude that under Civil Code Articles 2046 and 2047 the mineral lessee has standing to sue for dissolution of the contract when the lessor has not complied with his engagements, without the necessity of a putting in default before suit. If he is successful in obtaining dissolution, the lessee may also make his claim for compensatory damages. If lessee is unsuccessful in obtaining dissolution, and the court determines that the lessor will be given further time to perform or will be given an opportunity to pay, the question of a putting in default relates only to the lessee's right to claim moratory damages he has suffered as a result of the delayed payment.
I agree that under all the facts and circumstances of this case that Hibbert was not unjustified in withholding the royalty payments to the extent that the harsh remedy of cancellation can be claimed by the royalty owners.
The code provides a remedy for the royalty owners for the lessee's delay in paying the royalty due. Article 1935 provides:
"The damages due for delay in the performance of an obligation to pay money are called interest. The creditor is entitled to these damages without proving any loss, and whatever loss he may have suffered he can recover no more."
Article 1935 was in the original Code of 1808. In the Civil Code of 1870 for the first time we find the provision that "All debts shall bear interest * * * from the time they become due, unless otherwise stipulated." Our present Code provides the same language and fixed that rate of interest at 7 per centum per annum. Since all debts bear interest from the date they become due, without regard to their being categorized as damages, we are really not concerned with whether there was an active or a passive breach in the delay in making payment. The claimants are entitled to interest from the due date of each royalty payment without regard to the assignment of that interest as damages. Claimants should be awarded interest from the due date of each royalty payment until official tender. I must dissent from the majority's failure to award interest. I concur in other respects for the reasons here assigned.
NOTES
[1] This nineteen month period is considered as two periods: the first from December 9, 1961, the production date, until September 10, 1962, the demand for cancellation date; the second from September 10, 1962, until the date of the filing of the concursus proceeding on July 19, 1963. During the second period, the parties were attempting to settle the title dispute.
[2] Paragraph 9 of the lease provides: "All provisions hereof shall extend to and bind the successors and assigns (in whole or in part) of Lessor and Lessee; but no change in the ownership of the land or any interest therein of change in the capacity or status of Lessor whether resulting from sale, inheritance or otherwise, shall impose any additional burden on Lessee nor shall any change in ownership or in the status or capacity of Lessor impair the effectiveness of payments made to Lessor herein named unless the then record owner of said lease shall have been furnished thirty (30) days before payment is due with certified copy of recorded instrument or judgment evidencing such transfer, inheritance or sale or evidence of such change in status or capacity of Lessor. The furnishing of such evidence shall not affect the validity of payments theretofore made in advance. * * *"
[1] See also 2 Planiol, Civil Law Treatise, nos. 1307, 1318 (La.St.L.Inst. trans. 1959).
[2] See also Brown v. Sugar Creek Synd., 195 La. 865, 197 So. 583 (1940); Pipes v. Payne, 156 La. 791, 101 So. 144 (1924); Temple Oil v. Lindsay, 182 La. 22, 161 So. 8 (1935).