308 So.2d 453 (1975)
Louis A. CANIK et al., Plaintiffs-Appellants,
v.
TEXAS INTERNATIONAL PETROLEUM CORPORATION et al., Defendants-Appellees.
No. 4867.
Court of Appeal of Louisiana, Third Circuit.
February 12, 1975.
Rehearing Denied March 12, 1975.
Writ Refused April 24, 1975.
*454 Jones & Jones by Jerry Jones, Cameron, for plaintiffs-appellants.
Liskow & Lewis by Stephen T. Victory, New Orleans, and Liskow & Lewis by James L. Pelletier, Lafayette, for appellees.
Before FRUGÉ, CULPEPPER, and DOMENGEAUX, JJ.
DOMENGEAUX, Judge.
This is a suit by twelve lessors (tried before a jury) seeking the cancellation of oil, gas, and mineral leases held by defendants-lessees for alleged failure to timely pay royalties due under their respective leases. Prior to trial defendants filed a number of pretrial motions including summary judgment. Said motions were denied by the district court and writs were thereafter sought and refused by this court. Trial on the merits was subsequently had before a jury which resulted in a general verdict for the defendants. Plaintiffs have appealed to this court.
The facts leading up to this suit are as follows: In February, 1972, a lease block, which included ten separate leases on lands owned by the plaintiffs in Cameron Parish, Louisiana, was put together by one James Carlton Young, a lease broker. Subsequently the defendants acquired said leases, entering into a joint operating agreement under which Texas International Petroleum Corp. (hereinafter referred to as TIPCO) was designated as "Operator".
In May of the same year James Pelletier (attorney-partner with the law firm of Liskow and Lewis, Lafayette, Louisiana) was called upon by the defendants to examine an abstract and prepare a drill site title opinion on a portion of the land in the aforementioned lease block. Said title opinion was rendered on May 15, 1972, and covered only the acreage on the proposed drill site tract. Some of the title requirements pertaining solely to royalty interests were not satisfied in this title opinion but were deferred until it could be determined whether the well would produce in paying quantities.
On June 29, 1972, drilling operations commenced on a well situated on part of this abovementioned tract. The well (Miller Estate #1) was completed as "capable of producing oil and gas" in August, 1972, and "shut-in" at this time, pending receipt of an allowable from the Department of Conservation.
Meanwhile, four other leases on lands owned by four of the plaintiffs were added to the lease block on July 17, 1972. During this period, defendants also sought abstract covering all of the leases in the block. The abstracts (dividing the area into four tracts) were completed on August 7, August 14, September 12, and September 22 and were immediately thereafter sent to Mr. Pelletier to prepare title opinions therefrom. Title opinions were subsequently rendered on August 24, November 15, 1972, February 8, and March 14, 1973. Supplemental abstracts on each of these tracts were also ordered in January, and additional abstracts on other tracts in February, 1973, with title opinions being rendered on March 29, May 15, and May 22, 1973.
Once the aforementioned well was completed it appeared possible that it might be included within the "12,800' Sand, Reservoir A", which was then being produced from by Unit Wells "A and B", owned by Amoco and Texaco. As a result, an allowable could not be obtained until a public unitization hearing was held and an order issued by the Department of Conservation creating a new unit.
Therefore defendants applied for the creation of a unit, for the production from this well (Miller Estate #1), and on November 14, 1972, a public hearing was held. Pending a decision on the appropriate unit, *455 defendants were authorized [1] to commence production (which was done) on November 18, 1972, from the "12,800' Sand", with the understanding that when a unit order was issued it would be made retroactive to the date of first production.
The order creating a new "Unit C" and revising the existing "Units A and B" was issued by the Commissioner of Conservation on December 15, 1972, and received by defendants on December 21st. "Unit C" (composed of approximately 52.63 acres) included within its boundaries all or parts of the leases of the plaintiffs involved in this suit. Plaintiffs' lands, however, comprised only about one-half of the lands in "Unit C" held by the defendants.[2]
After issuance of the order, defendants engaged the services of C. Howard Fenstermaker, a civil engineer and land surveyor, requesting an immediate survey of "Unit C". Common boundaries had to be established with the adjoining "Units A and B". Likewise each individual tract in the unit was surveyed to determine how much participation each tract had in the entire unit. The survey was completed on January 19, 1973.
The Fenstermaker survey plat was received by TIPCO (the unit "Operator") on January 22 and copies thereof were transmitted to the other defendants, as well as Amoco and Texaco. The defendants were to review the proposed survey plat to determine whether the acreage included within the unit corresponded with their lease records. In turn, since Unit C had common boundaries with Units A & B both Texaco and Amoco had to have respective surveys of their own units made, which were then distributed to each other (and the defendants) to review, compare, and finally approve. On March 2nd, a confirmed survey plat was submitted to the Department of Conservation, which approved same on March 5, 1973.
In February, 1973, rental anniversary dates on ten of the aforementioned leases came due and as a result defendants computed and paid "Pugh Clause rentals" due each lessor for that area of each lease situated outside the unit (in order to maintain the outside acreage as additional drilling prospects). The computations were made by using the figures supplied on the January 19th Fenstermaker survey plat.
As aforementioned, supplemental title opinions by James Pelletier were being received by defendants throughout this period. Once the final opinions were received (with one exception) [3] and all serious questions were resolved regarding ownership of production, the royalty interests were then mathematically determined by defendants and a list compiled. A computation for each tract was then completed and on April 4 "Unit Division Orders" were prepared, mailed to each owner, and sent to defendants' royalty accounting department. Subsequently, in a special computer run on April 23, 1973, print out cards were prepared for each production account and royalty checks were issued and mailed on that date. Payment was made prior to any demand or inquiry by the plaintiffs regarding said royalties.
On April 27, 1973, a written demand was made on behalf of plaintiffs for cancellation of the lease, and after refusal by defendants, this suit followed.
*456 Only one issue is presented herein: Whether defendants' delay in paying production royalties was reasonable and justified under the facts and circumstances of this case?
As pointed out recently by our Supreme Court in Hibbert v. Mudd, 294 So.2d 518 (La.1974):
"`Our jurisprudence has developed the rule that failure to pay production royalties under an oil and gas lease for any appreciable length of time without justification amounts to an active breach of such lease which entitles the lessor to a cancellation thereof without the necessity of placing the lessee in formal default. (Cases omitted)
`However, in cases where the failure to pay production royalties is justified under the facts and circumstances, the breach is considered passive, requiring a putting in default. (Cases omitted)'
No precise or exact period of time is considered either reasonable or without justification insofar as application of this rule is concerned. However, implicit in the above decisions is that, in determining whether payment of production royalties has been unjustifiably withheld, the courts must examine the facts and circumstances of each case...."
Herein plaintiffs argue essentially the following: Defendants had all the necessary information to pay royalties on two of the leases owned by plaintiffs on January 23, 1973, (date that Fenstermaker's survey plat detailing unit participation for each owner was received) and for four other leases on February 8, 1973 (date one of title opinions received). It is contended that these royalty owners should have been paid immediately, rather than waiting until all of the royalty owners in the lease block could be paid.
In this respect it is pointed out that "Pugh Clause rentals" were paid to the lessees in February, 1973, on the basis of the Fenstermaker plat and that royalty payments could also have been made. Likewise it is argued that all but one of the defendants received a share of production payments previous to the time the royalty owners received anything.
Plaintiffs further allege that defendants had an ulterior motive for wanting to pay all the royalty owners at once, i. e. a desire to get all of the unit acreage[4] under lease before letting anyone know the value of future production.
Defendants on the other hand point out the following: Previous to the receipt of the Conservation Order on December 21, 1972, determination of the royalty interests within the unit was impossible. This is not seriously disputed by the plaintiffs. Thus approximately four months and two days passed before the royalty checks were mailed to the plaintiffs herein. During this period defendants were obtaining the necessary survey of the newly created unit, continuously acquiring abstracts and original and supplemental title opinions on the lands within the unit, and making the necessary calculations in order to pay royalties. This was a very complicated lease block area from an ownership and title examination standpoint. Abstracts which were prepared totalled in excess of 9,000 pages. Seven original title opinions and six supplemental opinions were prepared by Mr. Pelletier. Defendants ended up paying royalties to 93 separate owners, under the terms of 25 different leases, covering 39 individually surveyed tracts, involving all three units.
Charles Hebert, owner of the abstract company supplying the abstracts for defendants herein, indicated the aforementioned abstracts were prepared as quickly as possible (i. e. working 11 to 13 hours a day, 5 to 6 days a week) and that it was a "rush job". The abstracts were ordered on July 18, 1972, and completed by September 24th. Additional abstracts, bringing tracts *457 up to date, were ordered on January 12, 1973 (after Conservation Order received) and completed on January 19.
James Pelletier, defendants' title examiner, testified he initially prepared original (or preliminary) title opinions, noting thereon the defects which had to be remedied in supplemental title opinions in order that he could approve leasehold title of the defendants. There is no evidence to the effect that Pelletier did not do the curative title work in the customary time and expeditiously. In fact, two other title examiners testified (after examining the title opinions prepared) that it could not have been done quicker and that four to six months was a customary time. Pelletier stated that from January to March he spent approximately 75% of his time on this project.
Once defendants were given approval by their attorney to begin royalty payments, a "special computer run" was ordered so as to facilitate the issuance of the royalty checks.
Under these circumstances we find no significant delay on the part of defendants or the other parties involved (surveyor, abstractor, or title examiner).
We likewise find no evidence to support plaintiffs' contention that defendants had a willful, coercive intent and motive in waiting to pay the royalties, i. e. acquiring the remaining unleased lands within the unit before the respective owners had knowledge of the value of their lands due to inclusion within the producing unit. The record reveals that defendants were attempting to lease these lands previous to, as well as after, the issuance of the Conservation Order creating "Unit C". One of the unleased lands was in fact leased after the conservation order was issued, although obviously for a higher price. It also appears reasonable that anyone of interest in the area of the producing well would have acquired knowledge of this event either through publication of the conservation order in the legal notices or through "word of mouth". Likewise, the insignificant acreage involved, i. e. 3.281 acres, lends credence to the argument by defendants of the illogicalness of risking loss of the extremely valuable leases, for nonpayment of royalties, in order to acquire such a small tract.
The fact of payment of "Pugh Clause rentals" also is not pertinent to the problem herein. As pointed out by defendants, no extensive calculations, title opinions, etc. are necessary to pay rentals. The lessee only need pay the lessor, as specified in the lease, and need not worry about actual ownership of mineral royalties.
Defendants (with exception of Coastal States Gas Producing Co.) were admittedly paid a percentage of production previous to plaintiffs' receipt of royalty payments. Such payments were however made by the unit operator because of the "simplicity of handling their interests" on April 11, less than two weeks before royalty checks were mailed to plaintiffs. This fact, standing alone, does not in our opinion justify cancellation of the lease.
The outcome of this case actually balances on a single proposition: Were the defendants justified in withholding a number of royalty payments until all royalty owners within the unit could be paid at one time? Under the special facts and circumstances presented here, we opine defendants did not fail to pay royalties for an appreciable length of time without justification.
No real dispute exists as to the fact that defendants could have paid some of the royalty owners prior to April 23. As plaintiffs allege, defendants had all the necessary information on January 23, 1973, to pay on at least two of the aforementioned leases. It is argued, however, that it was the accepted policy in the oil and gas industry not to pay at this time until the survey plat had final approval from the Conservation Commissioner (March 5th in this case). The reason given for this practice was that if the submitted survey *458 plat is not accepted by the Commissioner and is altered even in the slightest degree, then the participation in the unit is also changed, and as a result the previous computations would be useless. Defendants do, however, admit that during this specific time interval they had received (starting December 31, 1972) payments for gas previously sold which could have been utilized for royalty payments. They point out, though, that receipt of payment for liquids did not come until February 28, 1973.
Thereafter defendants also received at times other title opinions which verified certain mineral owners within the unit. Likewise it is admitted payments could have been made in "piecemeal" fashion on these dates. However, it is argued that by "industry custom" leases within a unit are not paid individually, but at one time, after all supplemental title opinions have been received, all the data compiled, and the final computations made. One explanation for this practice is that when a number of leases are pooled into a unit it actually becomes as one lease and the lessees are obligated to pay on this basis. Another reason given for such a "custom" is that partial prepayment of one tract owner in advance of others would be "bad business", i. e. would create bad relations and antagonisms between the oil companies and royalty owners. Finally, defendants point out that a landowner could own interests in another tract, not covered by the selective lease on which a final title opinion had been rendered, and as a result he would not be receiving full payment of his royalty interests. It was, however, pointed out by defendants that this procedure is followed only if it can be done within a "reasonable time". Therefore in such a case where complaints are being received, or a serious defect on a particular tract exists which might cause extensive time delays, then the defendants would suspend royalty payments on the problem areas and proceed to make payments on the balance of the unit's interests.
Testimony on this point (by defendants' attorney and title examiner, representatives of defendants, and land men for various other oil companies) reflects that this procedure is generally accepted and followed in the oil industry. In fact no evidence was introduced to indicate that the practice of any oil companies, in regard to paying royalty owners within a unit, was different from that of defendants.
Under the foregoing facts we conclude that defendants (through TIPCO as "Operator") operated in good faith with plaintiffs-lessees and that the delay occasioned was both reasonable and justified.[5] As a result no active breach of the lease took place and as aforementioned defendants were not "put in default", i. e. no demand or inquiry was made prior to payment.
For the reasons assigned the judgment of the trial court denying plaintiffs' claim for lease cancellation is hereby affirmed. All costs of this appeal are assessed to plaintiffs.
Affirmed.
NOTES
[1] The Commissioner of Conservation felt the new well was within the same reservoir as the Amoco and Texaco wells in the already existing units, but agreed to allow production to protect further drainage of the acreage surrounding the well.
[2] Several other tracts (three in number) had not been leased by defendants at this time. One of the three was, however, thereafter acquired.
[3] One title opinion was not received until May 22, 1973. In this regard, Mr. Pelletier testified that he advised the defendants early in April, 1973, to begin paying the royalty owners before the final title opinion had been completed. This was based on the fact that he had examined the last abstract which was very lengthy and covered only a very small tract within the unit, and could foresee no problems in respect to title.
[4] As aforementioned, three tracts within the unit (totalling 3.281 acres) were unleased as of the date the Conservation Order was received.
[5] This is a course not to say that similar time periods of delay in paying royalty owners would be justified and reasonable under different facts and circumstances.