633 So.2d 1345 (1994)
James B. HANKS
v.
Thomas M. WILSON, III, Sandra Fuller Wilson and Amoco Production Company.
No. 93 CA 0554.
Court of Appeal of Louisiana, First Circuit.
March 11, 1994.
R. Loren Kleinpeter, Baton Rouge, for plaintiff-appellant James B. Hanks.
James L. Williams, L. Linton Morgan, Metairie, for defendants-appellees Thomas Wilson, III and Sandra Fuller Wilson.
J. Clayton Johnson, Baton Rouge, for defendant-appellee Amoco Production Co.
Before FOIL, PITCHER and PARRO, JJ.
PITCHER, Judge.
In this mineral law litigation, plaintiff, James B. Hanks (Hanks), appeals the portion of the trial court judgment dismissing his claim against defendant, Amoco Production Company (Amoco), for improper payment of royalties in the sum of $49,580.85 allegedly due from Amoco to Hanks by virtue of an assignment of a mineral royalty interest. We affirm.

FACTS
The facts are not in dispute. On August 12, 1975, Daniel E. Littleton (Littleton) executed an oil, gas and mineral lease wherein he leased his undivided one-half mineral interest in 159 acres that he owned in Pointe Coupee Parish to James L. Moore. The leased premises subsequently became a part of the Morganza Field. At all times pertinent in this action, Amoco was the lessee under the mineral lease.
On February 10, 1983, Littleton executed a royalty deed in favor of T.M. Wilson and Sandra Fuller Wilson in which Littleton conveyed *1346 100% of his remaining royalty interest arising out of the mineral lease to the Wilsons.[1] As a result of this sale, Littleton remained owner and lessor of an undivided one-half mineral interest in the leased premises, with the right to receive rental payments due under the lease, but not royalties.
On February 25, 1983, the Wilsons executed an assignment of mineral royalty interests, which created a reversionary mineral royalty interest in favor of Littleton in the royalty interest which the Wilsons had purchased from him on February 10, 1983. By this act, the Wilsons assigned back to Littleton one-half of their royalty interest to:
become effective only at such time and upon such date as Assignor obtains sufficient production revenues, from any well drilled either on the leased premises or on lands pooled therewith, to recover all costs incurred with his acquisition of same including interest on investment.
The assignment did not contain a specific mathematical formula to determine when the reversionary interest would become effective. As a result of this assignment, Littleton now owned a reversionary royalty interest in one-half of the production royalties he had previously conveyed to the Wilsons, as well as an undivided one-half mineral interest which he already owned in the leased premises. Littleton did not record the assignment.
By mineral deed, on April 16, 1985, Littleton sold his undivided one-half mineral interest to Hanks, subject to Littleton's prior conveyances of 100% of the royalties due to the lessor. Hanks recorded the assignment of mineral royalty interests on April 23, 1985 and the mineral deed on June 4, 1985. Hanks thereafter sent to Amoco four letters which are pertinent to this action.
The first letter, dated June 25, 1985, provided Amoco with a certified copy of the mineral deed. Amoco's response letter, dated July 23, 1985, acknowledged receipt of the deed and informed Hanks that Amoco would pay future rental payments to him. Amoco made rental payments to Hanks, but continued to pay royalties arising under the mineral lease to the Wilsons or the Wilsons' bank.
The second letter, dated October 1, 1987, alleged that Amoco had substantially underpaid royalties on the decimal interest because Amoco had underestimated the actual number of acres in the leased tract. The letter demanded that Amoco correct the error and pay royalties using the correct decimal interest to the owner, "T.M. Wilson-A/W Peoples Bank and Trust Co."[2] The letter further stated that Hanks was the record mineral owner of the leased premises and owner of a recorded reversionary mineral royalty interest. Amoco continued to pay royalties to the Wilsons.
The third letter, dated December 1, 1987, alleged that the "division interest for royalty owner, T.M. Wilson-A/W Peoples Bank and Trust Co," was incorrect because of survey errors. The letter requested that Amoco change the division interest and pay [the Wilsons] the difference in the royalties owed. The letter stated that if the correct royalties for all wells and units affecting the lease were not received within 30 days of its receipt, legal action would be instituted.
The fourth letter, dated March 24, 1988, provided Amoco with a certified copy of the assignment of mineral royalty interests, a certified copy of a quitclaim deed from Littleton to Hanks and a copy of the Wilsons' mortgage to Peoples Bank and Trust Co., which covered the mineral royalty interest purchased from Littleton. The letter stated that the mortgage was paid in December. The letter further stated that, pursuant to LSA-R.S. 31:137 et seq., Amoco was put on notice that Hanks owned a mineral royalty interest (the former reversionary interest). The letter also demanded that Amoco issue a transfer order for the royalty interest at issue, correct the alleged error in the decimal interest used for "T.M. Wilson," and change the ownership interest to include Hanks as an owner.
*1347 Although Hanks claimed in his March 24, 1988 letter to Amoco that his share of the mineral royalty interest had reverted to him, the Wilsons claimed that the suspensive condition in the assignment had not yet occurred. Amoco immediately began suspending payment of one-half of the royalties to the Wilsons arising out of the assignment, beginning in May of 1988, which included royalties for April of 1988.
On February 1, 1989, Hanks filed this suit against Amoco and the Wilsons, seeking to have his ownership interest in the mineral lease recognized, arguing particularly that the reversionary interest had become effective.
Amoco answered the petition and, by reconventional demand, invoked a concursus proceeding for the determination of the ownership of the mineral royalty interest. Amoco deposited all of the suspended royalties in the registry of the court.

ACTION IN THE TRIAL COURT
The trial court found that the Wilsons' cost of acquisition for the mineral royalty interest was $325,500.00, which included attorney's fees of $500.00; that the interest on the investment was the interest rate charged by Peoples Bank and Trust Company on the $325,000.00 loan to the Wilsons; that the reversionary mineral royalty interest came into effect in December of 1987, when the Wilsons, upon receipt of the initial $1,961.99 in royalties for that month, finally recovered their acquisition and interest costs; that Hanks owned the reversionary mineral royalty interest; that the Wilsons were liable for royalties Amoco paid to them after the reversion occurred; and that Amoco acted reasonably in paying the royalties to the Wilsons and in subsequently suspending payment of the royalties in dispute.
Judgment was entered in favor of Hanks and against the Wilsons for $49,580.85, together with legal interest from the date the Wilsons received the royalties until paid. The judgment declared Hanks the owner of the monies deposited in the registry of the court, and dismissed, with prejudice, Hanks' claim against Amoco for royalties in the amount of $49,580.85, which Amoco paid the Wilsons between December of 1987 and April of 1988.
Hanks timely filed a motion for a partial new trial which was limited to the dismissal of his claim against Amoco for the royalties paid to the Wilsons. The trial court denied the motion, and Hanks perfected this devolutive appeal. The Wilsons did not appeal the trial court judgment; therefore, the judgment is final as to the Wilsons.
On appeal, Hanks sets forth the following assignment of error:
The trial court erred in failing to hold that Amoco had a liability to pay Hanks, as mineral lessor, royalty payments from the very moment the reversionary interest became effective.
Hanks contends that Amoco is liable to him for the royalties that Amoco paid to the Wilsons after December of 1987, which was the effective date of the reversionary interest.[3]
Amoco, however, contends that under Paragraph 9 of its mineral lease, the lessee (Amoco) is relieved from the obligation to pay royalties to the assignee (Hanks) of the lessor's royalty rights until the lessee has been provided with appropriate evidence of the change in royalty ownership. Amoco contends that the June 25, 1985 letter had nothing whatsoever to do with the ownership of the mineral royalty interest. Amoco contends that the language in the October 1, 1987 and December 1, 1987 letters demanding royalty payments was general and dealt with specific decimal interest issues related to unit surveys, and neither letter was sufficient to put Amoco on notice that the reversion had occurred. Amoco contends that its first notice of the assignment of the mineral royalty interest was the March 24, 1988 letter.
Before we address the foregoing contentions, we must turn our attention to a preliminary *1348 issue raised by Hanks' counsel. In the rebuttal portion of his oral argument before this court, Hanks' counsel claimed (for the first time) that Amoco, by way of brief filed before this court, had raised an affirmative defense for the first time in these proceedings. We requested the parties to submit supplemental briefs on this issue to this court.

PLEADING AN AFFIRMATIVE DEFENSE
Hanks contends that Amoco's arguments that it should not be required to pay royalties pursuant to Paragraph 9 of its mineral lease because it did not have a certified copy of the assignment which created the reversionary interest and/or Hanks did not provide Amoco with evidence of his change in status, raise an untimely affirmative defense which was not raised in the pleadings or argued in the trial court.
The defendant is required to affirmatively set forth in his answer any matter constituting an affirmative defense on which he will rely. LSA-C.C.P. art. 1005.
The purpose of the requirement that certain defenses be affirmatively pleaded is to give the plaintiff fair and adequate notice of the nature of the defense and, thereby, prevent last minute surprise to the plaintiff. Georgia Pacific Corporation v. Ardenwood-Melrose, Inc., 348 So.2d 748, 750 (La.App. 1st Cir.1977). An affirmative defense raises new matter which, assuming the allegations in the petition to be true, constitutes a defense to the action and will have the effect of defeating plaintiff's demand on its merits. Webster v. Rushing, 316 So.2d 111, 114 (La.1975).
Pretermitting any determination of whether Amoco's argument constitutes an affirmative defense, we find that Hanks' contentions lack merit. Hanks could have reasonably anticipated that Amoco, in defending the suit, would rely on any one or all contractual provisions of the very same mineral lease (Plaintiff's Exhibit 1) under which he sought to hold Amoco liable for unpaid royalties. Amoco's arguments in its brief did not raise new matter. Amoco contends, and we agree, that the issue has repeatedly been before the court from the outset of the case. The issue was raised in the original pleadings and the pre-trial order.
The petition alleged that Hanks, by letters dated October 1, 1987, December 1, 1987, March 8, 1988 and March 24, 1988, made written demand on Amoco for timely and proper payment of royalties due Hanks. The petition further alleged that Amoco received notice, by Hanks' letter dated June 25, 1985, of the reversionary mineral royalty interest created by the assignment of mineral royalty interests and that Amoco owed Hanks royalties arising out of the mineral lease as of that date.
Amoco, in its answer and reconventional demand, admitted receiving the letters and, averring that the letters and the act of assignment were the best evidence of their contents, denied any allegations inconsistent with their contents. In further answering the petition, Amoco averred that it had not been able to determine when the conveyance, on which Hanks' rights depended, was effective and that this determination was a principal issue of the lawsuit.
The pre-trial order lists, as a contested issue, the question of whether Amoco had sufficient information to make a definitive legal determination that the mineral royalty interest had reverted to Hanks.
The mineral lease is the law between the parties. The assignment of mineral royalty interests clearly states that "it is subject to all of the terms and provisions contained in the lease affected hereby." Paragraph 9 is a provision of the lease. Therefore, in determining the ownership of the mineral royalties at issue, Amoco was required to look first to the mineral lease. See LSA-R.S. 31:3; LSA-C.C. art. 1983. That Amoco would look to and rely on Paragraph 9 could hardly have come as a last minute surprise to Hanks.
Moreover, when we read the entire record, as we are required to do, we find that the notice issue was argued to the trial court, not only by Amoco but by Hanks as well, in post-trial proceedings on Hanks' motion for partial new trial.
In his brief to the trial court filed on behalf of Hanks, counsel stated:

*1349 The effectiveness of an assignment are [sic] governed by Paragraph 9 of the lease which provides as follows:
* * * * * *
Amoco received the evidence of the assignment by letter dated June 25, 1985, (Plaintiff's Exhibit 5) a copy of which is attached hereto....
* * * * * *
From that point in time forward, Amoco was obligated to make correct and timely payments to Hanks for his mineral interest, at the time the reversionary interest became effective.
During oral arguments on the motion, Hanks' counsel raised the Paragraph 9 issue again when he clearly stated:
[P]aragraph nine of Amoco's own lease says that ... once they start paying the owner, they don't have to pay anybody else who becomes record owner unless they have beengiven ... forty-five days notice from the record owner with a certified copy of the instrument evidencing the ... transfer of the mineral interest....
* * * * * *
[Amoco's] lease specifically says, all you got to give me is a certified copy of a recorded instrument or judgment evidencing such sale, transfer or inheritance or with evidence of such change in status. It's an or. When they got the certified copy of the reversionary interest some two and a half years before it kicked in, they had gotten that....[4]
The record shows that Amoco's counsel also argued the Paragraph 9 issue at the trial of the motion:
What paragraph 9 of the mineral lease ... indicated was that it was not up to Amoco to decide when that reversion took place; it was up to Mr. Hanks to provide Amoco with evidence of when that reversion took place.... [P]aragraph nine says that the change in status ... would take place when the record owner of the lease should have been furnished with evidence of such change....
* * * * * *
There ... is abundant jurisprudence that indicates that paragraph nine ... is there to protect the lessee so that the lessee doesn't have to continuously be making his own determination of when some change in ownership takes place.
When the pleading at issue is construed in its entirety with all other matters occurring in the trial court which relate to the pleading, it is more reasonable than not to conclude that Hanks was given fair notice and was more than adequately apprised of the procedure by which Amoco intended to defeat his claim. See Townsend v. Cleve Heyl Chevrolet-Buick, Inc., 318 So.2d 618, 623 (La.App. 2nd Cir.1975). Therefore, we find no merit in Hanks' claim.
Having thus decided, we now determine whether the trial court erred in failing to find Amoco liable for the royalties which Amoco paid to the Wilsons prior to its receipt of the March 24, 1988 letter.

AMOCO'S LIABILITY TO HANKS
Hanks contends that Amoco was obligated to pay royalties to him at the very moment the reversionary interest became effective. Hanks argues that Amoco was obligated to do so because Amoco possessed actual and/or constructive notice of the assignment of the reversionary mineral royalty interest prior to March 24, 1988, by virtue of the June 25, 1985 letter and updated title opinions performed by Amoco. We disagree.
Prefatory language in the mineral lease states, in part, that the lease "without further evidence thereof, shall immediately attach to and affect any and all rights, titles, and interests in the [leased premises], including reversionary mineral rights, ... acquired by or inuring to Lessor and Lessor's successors and assigns." After reviewing the subject lease, we find Paragraph 9 dispositive of the issue of whether Amoco properly paid royalties.
*1350 Paragraph 9 of the mineral lease provides in pertinent part:
All provisions hereof shall inure to the benefit of and bind the successors and assigns (in whole or in part) of Lessor and Lessee, but regardless of any actual or constructive notice thereof, no change in the ownership of the land or any interest therein or change in the capacity or status of Lessor or any other owner of rights hereunder, whether resulting from sale or other transfer, inheritance, interdiction, emancipation, attainment of majority or otherwise, shall impose any additional burden on Lessee, or be binding on Lessee for making any payments hereunder unless, at least forty-five (45) days before any such payment is due, the record owner of this lease shall have been furnished with certified copy of recorded instrument or judgment evidencing such sale, transfer or inheritance, or with evidence of such change in status or capacity of Lessor or other party owning rights hereunder. The furnishing of such evidence shall not affect the validity of payments theretofore made in advance....
Obviously, the purpose of a clause such as Paragraph 9 is to protect the lessee against the possibility of losing a lease by reason of failure to pay rentals, royalties or other payments to the person entitled thereto after a change in the ownership of the land or interest therein of any person previously entitled to receive such payment. Lapeze v. Amoco Production Co., 842 F.2d 132, 134 (5th Cir. 1988).
In giving effect to lease language identical to Paragraph 9, the court in Lapeze v. Amoco Production Co. stated:
The inescapable fact is that defendant was compelled to make the payment in conformity with the specific provision of the 1976 lease. They were forbidden by the lease from taking a successors' [sic] word as to his successorship for purposes of payment (Par. 9: "regardless of any actual or constructive notice"). It has been generally accepted that the lessee's better course in such "catch 22" situations is to comply with the literal terms of the lease, regardless of the lessee's actual or constructive knowledge, and to direct payment to the original lessor until the stipulated evidence of change of ownership is furnished. `The lessee is protected when he relies on failure to furnish proof of change of ownership, but is not protected when he relies on anything else.' (citations omitted)
842 F.2d at 135.
Similarly, in Hibbert v. Mudd, 294 So.2d 518, 523 (La.1974), a clause almost identical to Paragraph 9 was construed as protecting the lessee as to the effectiveness of payments made without benefit of certified evidence of a change in ownership and against the imposition of additional burdens resulting from the change until the lessee received certified evidence.
Furthermore, in Atlantic Refining Company v. Shell Oil Company, 217 La. 576, 46 So.2d 907, 909 (1950), judgment was rendered against the lessee that had relied upon information it independently acquired from the public records.
Turning to the instant case, we find that the June 25, 1985 letter merely provided Amoco with a mineral deed evidencing Hanks' status as owner and lessor of an undivided one-half mineral interest in the leased premises. Under the facts presented here, this deed had nothing to do with the ownership of royalties attributable to the minerals under the lease because Littleton, Hanks' ancestor in title, alienated 100% of his royalty interest prior to the sale of the leased premises to Hanks.
The obvious import of the October 1, 1987 and December 1, 1987 letters is that Amoco correct alleged errors in the unit decimal ownership interests and pay royalties accordingly. Significantly, these letters inform Amoco that Hanks is the owner of a "reversionary" mineral royalty interest, which is to be distinguished from being the owner of a "present" mineral royalty interest.
The record clearly establishes that Amoco was not provided with certified evidence of the recorded assignment of mineral royalty interests until receipt of Hanks' March 24, 1988 letter. However, this assignment was subject to a suspensive condition. Thus, the act, although in proper form, evidenced only that Hanks was the owner of a reversionary mineral royalty interest in one-half of the royalties previously conveyed to the Wilsons. *1351 This evidence alone was not sufficient to put Amoco on notice that the suspensive condition had occurred. As noted earlier, the assignment did not contain a mathematical formula for determining when the reversion would occur.
The record is conspicuously void of any evidence to establish that Hanks provided Amoco with the required certified proof evidencing a change in his status from being the owner of a reversionary mineral royalty interest to the owner of a present mineral royalty interest. Without such evidence, Amoco, under the express provisions of Paragraph 9 of the mineral lease, was not bound to pay royalties to Hanks, regardless of any actual or constructive notice Amoco may have had, unless Hanks, at least 45 days before the royalty payment was due, furnished Amoco with the required proof. This assignment of error is without merit.

CONCLUSION
For the foregoing reasons, the portion of the judgment appealed from in favor of the defendant, Amoco Production Company, and against the plaintiff, James B. Hanks, dismissing, with prejudice, the remainder of the plaintiff's demands against the defendant, is affirmed. All costs of this appeal to be paid by the plaintiff, James B. Hanks.
AFFIRMED.
NOTES
[1] Littleton, prior to the events giving rise to this action, had alienated a portion of his royalty interest under the mineral lease.
[2] If the Wilsons received more royalties, the mineral royalty interest created in the assignment would revert to Hanks at an earlier date.
[3] In the petition, Hanks sought double damages and attorney's fees provided for in LSA-R.S. 31:140 or, alternatively, lease cancellation, but did not seriously advance the claim at trial. On appeal, Hanks no longer seeks these remedies.
[4] This reference is to the June 25, 1985 letter. The face of the letter, however, shows that a copy of the assignment of mineral royalty interests was not enclosed.